UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
DAN HARKABI,
GIDON ELAZAR,

    Plaintiffs,

vs.

SANDISK CORPORATION,

    Defendant.
------------------------------------X

Index No.: 08-CV-8203(WHP)(THK)

ECF CASE

**COMPLAINT**

  Plaintiffs Dan Harkabi ("Harkabi") and Gidon Elazar ("Elazar"), by their attorneys Stillman, Friedman & Shechtman, P.C., for their complaint against defendant SanDisk Corporation ("SanDisk") for breach of contract and breach of the implied covenant of good faith and fair dealing, respectfully allege as follows:

**I. NATURE OF THE ACTION**

  1. In 2004, SanDisk, one of the world's largest supplier of flash memory products, acquired MDRM, Inc. ("MDRM"), a private company that had recently developed technology that stood to revolutionize the flash drive industry. A portion of the $14 million acquisition price included $4 million to be earned over a two year period. Under a written agreement between SanDisk, MDRM, Harkabi (as "Seller's Representative"), and the shareholders of MDRM (including Harkabi and Elazar), SanDisk was required to release the $4 million that had been placed in escrow if the MDRM technology or a derivative of that technology was used in SanDisk products and at least 3.2 million units of those products were sold by December of

2006. In addition, SanDisk required that Harkabi and Elazar move from Israel to the United States and become employees of SanDisk.

2. Over the next two years, SanDisk used the MDRM technology in two consumer products, the Cruzer Freedom and the U3 series of flash drives. Sales of the U3 alone exceeded the earn out trigger five-fold. SanDisk sold approximately 15 million units during the relevant period, earning SanDisk between $150-$200 million. However, SanDisk has wrongfully refused to pay the $4 million earn out. Indeed, rather than pay the fully-earned $4 million, SanDisk fired Harkabi and Elazar claiming that action was a part of supposed cost-cutting layoffs (the "reduction in force" or "RIF").

3. Based on the factual allegations set forth below, Harkabi and Elazar assert claims against defendant for breach of contract and breach of the implied covenant of good faith and fair dealing.

## II. PARTIES AND JURISDICTION

4. The plaintiffs are citizens of Israel. The defendant is a corporation incorporated under the laws of Delaware with its principal place of business in California. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332. Because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

5. The parties have agreed to venue and personal jurisdiction in the Southern District of New York in the contract at issue in this case.[1]

---

[1] *See* Exhibit 1, Amended and Restated Stock Purchase Agreement (the "Contract"), § 10.7.

### III. **FACTUAL BACKGROUND**

6. Harkabi and Elazar are entrepreneurs in the field of USB flash drive technology who have pioneered significant advances in the industry. For several years, they focused their time and energy developing the technology to securely distribute and control the use of copyrighted digital content using flash drives. They formed a company, MDRM, Inc., based in Israel, through which to develop and market their technology.

7. Although based abroad, MDRM was formed as a Delaware corporation with five stockholders, including Harkabi and Elazar. Harkabi served as the Chief Executive Officer of MDRM, while Elazar served as its Chief Technology Officer. Harkabi and Elazar collectively owned 92.46% of MDRM's stock (each owning 46.23% respectively).

8. MDRM's technology represented a significant advancement in flash drive technology. Instead of using flash drives as static memory cards, drives using MDRM's technology have unique identifiers which allow consumers to remotely access secure content from the world wide web. MDRM technology also allows the software and firmware[2] in the drives to be updated, revised and modified remotely as needed. The crux of MDRM's technological advancement was the development of firmware that could be downloaded onto flash drive hardware in a manner that securely controls use of copyrighted material being downloaded. An early application of MDRM's work is found in its BookLocker technology, which consists of hardware, software, and firmware.[3]

---

[2] Firmware is software embedded in a hardware device.

[3] A BookLocker flash drive enables consumers to securely download and store electronic textbooks. When a user plugs a BookLocker flash drive into a computer, the user can securely download copyrighted textbooks directly to the device. This copyrighted material remains on the flash drive, but, signficantly, it cannot be copied onto another drive or computer. The user then carries the electronic textbook on the flash drive, and can read the content on any computer at

## SanDisk Acquires MDRM

9.  SanDisk has a market capitalization of over $5 billion, with revenues of over $3.8 billion in 2007. With approximately 600 issued U.S. patents and more than 300 foreign patents, SanDisk is the only company in the world with the rights to both manufacture and sell every major flash card format.

10. In early 2004, SanDisk made an unsolicited offer to acquire MDRM. In the months preceding this offer, the two companies had been collaborating on developing a new flash drive that incorporated technology from both companies. During this collaboration, SanDisk came to appreciate the value associated with the MDRM technology. During the ensuing acquisition negotiations, SanDisk executives repeatedly told plaintiffs how valuable and important MDRM's technology was to SanDisk's long term goals and competitive strategy. In agreeing to a deal, plaintiffs relied on the statements of Chief Executive Officer of SanDisk, Eli Harari ("Harari") that the MDRM technology would be incorporated into SanDisk's wide array of flash memory products and would be promoted and distributed broadly. Indeed, SanDisk indicated that it intended to have secure content distribution (MDRM technology) integrated into every SanDisk flash device.

11. At the time, plaintiffs' own conservative valuation of MDRM was $16-18 million. After a period of negotiations, the parties settled on a $14 million acquisition price: $4 million in cash up front, $6 million in stock, and a $4 million earn out based on meeting stated sales targets. Because all parties recognized that the $4 million earn out would be easily met, SanDisk set aside the entire $4 million and placed it into escrow. Under the terms of the earn out provision,

---

any time. Thus, MDRM overcame a digital copyright dilemma by pairing a digital rights management solution for publishers with a seamless and user-friendly experience.

SanDisk was required to release the entirety of the funds from escrow if it "uses or embeds" the MDRM technology or its Derivatives in SanDisk products and SanDisk "sells" 3.2 million or more of these products before December 2006. Contract, § 1.4. Otherwise, SanDisk must release a pro-rated share of the funds based upon the sales figures. Under the Contract, "MDRM technology" is defined as "firmware developed by [MDRM]" before December 2, 2004. *Id.* The term "derivatives" is defined broadly as any modification, revision or adaptation "that is derived in any manner, directly or indirectly, from the MDRM technology or any part or aspect thereof or…any other form in which the MDRM technology may be recast, transformed or adapted." *Id.*

12. Under the terms of the earn out provision a product is "sold" for purposes of the earn out provision if the item (1) was marketed by SanDisk by reference to the MDRM Technology or Derivatives thereof or to their functions and/or capabilities, or (2) was used by SanDisk to provide content stored on such item, or to update firmware, upload or download data, or any other use which is enabled by the MDRM Technology or Derivatives thereof, or (3) was pre-activated by a customer, distributor, reseller or any other channel for ultimate sale to an end-user that results in revenue recognition on the sale of the MDRM unit. *Id.*

13. As part of the Contract, SanDisk committed to "dedicate four full time equivalent marketing employees to the promotion of the MDRM units until the two year [earn out] date." *Id.* It also agreed to allocate a commercially reasonable portion of each of its North American sales conferences to the promotion of the MDRM units. SanDisk further agreed to give consideration to the promotion and marketing of the MDRM units as part of its overall, global corporate strategy. *Id.*

14. Finally, SanDisk also agreed to a "Best Efforts" clause, committing to use commercially reasonable efforts to take "all actions, and to do, or to cause to be done, all things

5

necessary, proper or advisable under applicable law in order to fulfill and perform its obligations" under the Contract. *Id.* at § 5.2.

15. Believing that SanDisk was negotiating and operating in good faith and would comply with these contractual terms, plaintiffs agreed to sell MDRM to SanDisk. The sale closed on December 2, 2004.

### Plaintiffs' Work at SanDisk

16. As part of the acquisition, SanDisk insisted that both Harkabi and Elazar come to work at SanDisk, as their services were vital to integrating the MDRM technology at SanDisk. While Harkabi and Elazar were reluctant to uproot their families and leave their homes in Israel, SanDisk said this was part of the deal and that they needed to move to the United States as soon as possible. Once again, believing that SanDisk was acting in good faith, Harkabi and Elazar uprooted themselves, their wives, and their small children to move from Israel to California.

17. After acquiring MDRM, SanDisk gave MDRM the new name of SanDisk Secure Content Solutions ("SCS"). When he joined SanDisk in December of 2004, Harkabi became Vice President of SCS, where he was responsible for the development of end-to-end content distribution and managed a team that grew to over 20 SanDisk employees. Elazar became Senior Director of System Architecture. He was responsible for all SCS product management and development. Both the SCS product manager and the SCS Israeli Site Manager/Vice President of Research and Development reported to him.

### MDRM Technology Used in SanDisk Devices

18. When Harkabi and Elazar joined SanDisk, they worked initially on the production and manufacturing of the Cruzer Freedom flash drives. This drive uses the MDRM technology. A

6

user can plug this flash drive into a computer and download digital books, music, games, and educational tools.

19. At the time, SanDisk was organized in divisions. The Marketing division, headed by Executive VP Nelson Chan ("Chan") and a newly formed Emerging Markets division headed by Senior VP Yoram Cedar ("Cedar") which was responsible for innovative products and included three teams: SCS, U3 and Mobile (Cellular). The background for forming this new division was Cedar's claims that the Marketing division had failed to drive product innovations. The strain between Cedar and Chan affected the work of the divisions and created an atmosphere of non-cooperation. Both SCS and U3 teams built products based on USB memory sticks, which were to be sold by the USB Retail team in Marketing. Due to the tensions between the divisions, however, Marketing opposed any product from Emerging markets, including the Cruzer Freedom, and impeded access to the retail channels such as Wal-Mart, K-Mart, Best Buy, and Circuit City, where the vast majority of SanDisk products are sold.

20. Contrary to promises made during the acquisition and in the Contract itself, SanDisk failed to dedicate sufficient marketing resources to the Cruzer. The Marketing division objected to this new form of technology, and despite complaints from senior executives such as Cedar, they refused to expend the resources needed to market the device properly. The plaintiffs approached Harari, and requested his involvement in forcing the company to market the product. He responded that plaintiffs would have to manage by themselves and that he was certain that it would take approximately six months for everything to "settle down." As a result of this anemic marketing effort, unit sales of the Cruzer totaled fewer than 112,000 units in the last five quarters. SanDisk agreed that the Cruzer incorporates the MDRM technology, but because sales

were so low, SanDisk has paid less than $140,000 of the total $4 million earn out based upon Cruzer sales.

21. Contrary to his approach with the Cruzer Freedom, Harari did force the company to market the next product to incorporate the MDRM technology, the U3 flash drive. By early 2005, Harkabi and Elazar became involved in SanDisk's production of the U3, initially created as a joint venture between SanDisk and M-Systems (a company acquired by SanDisk in 2006 for approximately $1.6 billion). The U3 was intended as a means of secure software distribution. Thus, it needed similar security features to the MDRM BookLocker that would provide a means to authenticate each flash drive unit when the unit is plugged into a computer.

22. It was initially intended that the U3 would use drivers that would generate unique security codes on each device during manufacturing. When it became clear that these drivers would not be available in time to meet manufacturing deadlines, the U3 team decided to use the manufacturing system developed using MDRM technology for the Cruzer Freedom, which downloads security codes from a dedicated server through what are known as device identifications, or "DIDs."

23. The system ultimately used in the U3 is the same system originally developed by MDRM for its BookLocker product. Indeed, each step of the U3 manufacturing process uses MDRM technology or derivatives thereof. This technology is used in (i) the generation of DIDs, (ii) the transmission of DIDs through a server to a manufacturing platform, (iii) the decryption of the DIDs through the use of a "golden key,"[4] (iv) the downloading of DIDs onto the U3 flash drives, and (v) the development of the U3 firmware that accepts and processes the DIDs. In

---

[4] All of the DIDs were encrypted for security purposes. The golden key is used in the final stage before production to decrypt the DIDs so that they can be used to manufacture the units. This process was developed by MDRM and was used in the BookLocker product.

short, the U3 plainly uses or embeds the MDRM technology under the terms of the Contract. SanDisk sold approximately 15 million U3 units during the relevant period, earning SanDisk between $150-$200 million.

**SanDisk Concedes the Full Earn Out is Triggered**

24. During their time at SanDisk, plaintiffs were told repeatedly by Cedar and others that the earn out provision was satisfied and MDRM would be paid the entire $4 million. These discussions arose because, initially, SanDisk did not include the U3 sales on a quarterly report related to the earn out. Immediately after seeing that report in the spring of 2006, plaintiffs raised the issue to SVP of Engineering Cedar. Cedar assured them that they had earned the money, that they would be fully compensated, and that SanDisk simply needed appropriate documentation, suggesting it was a mere formality. Cedar was in a position to know at the time that the MDRM technology was used in the U3. He was also a very senior member of SanDisk's management team. Believing the issue was resolved, plaintiffs complied with requests for such documentation in the spring and summer of 2006.

25. When SanDisk failed to include the U3 sales in the next quarter's earn out report, Harkabi and Elazar again complained. In September of 2006, Harkabi and Elazar met with Harari, Cedar, Vice President of Business Development Richard Chernicoff ("Chernicoff") and others to review the factual basis for the earn out. At the conclusion of this meeting, the SanDisk executives once again confirmed that the earn out had been satisfied and would be paid. Indeed, Chernicoff gave instructions to prepare a check for one of the MDRM shareholders with which he had an upcoming meeting, in order to pay that shareholder his portion of the earn out.

### SanDisk Refuses to Pay the Earn Out and Fires Plaintiffs

26. At the conclusion of the meeting, Harari approached plaintiffs to discuss unrelated matters: Harari informed plaintiffs that he had been told that they had concerns about the security of the U3 device. While plaintiffs were initially reluctant to go over the head of their immediate boss, SVP of Engineering Cedar, Harari told plaintiffs they had an obligation to tell him. They discussed with Harari that the security engine used in the U3 and other products suffered from over-engineering which drove up the cost to produce, and that the security of the device was problematic. Additionally, they warned that the U3 product was potentially flawed in connection with its functionality that provided for auto-launch.[5] They also told Harari of their suspicion that the U3, as then configured, would not work with Microsoft's soon-to-be released Windows Vista operating system and that this issue had previously fallen on deaf ears.[6]

27. Harkabi and Elazar thought that SanDisk had an obligation to inform consumers and correct the defect. Harari immediately told Cedar of plaintiffs' concerns. Cedar called Harkabi that evening. Cedar angrily accused Harkabi of going to the CEO behind his back and that in all his years at SanDisk, Harari had never "chewed him out" like he had that night.

28. Within a few weeks of this conversation, Cedar told plaintiffs for the first time that there was a problem with the earn out. Despite plaintiffs' clear explanations of how their technology was incorporated into the U3 manufacturing process and SanDisk's previous and repeated commitment to pay the earn out, SanDisk told Harkabi and Elazar that the company

---

[5] This potential flaw was unrelated to the underlying MDRM technology.

[6] They suspected this possibility because the U3 had been configured to take advantage of a security hole in the current Windows XP operating system. This configuration was potentially problematic for two reasons: first, it allowed hackers to install virus programs on U3 devices which could then auto-launch and run invisibly on a consumer's computer. Second, if this security hole was detected by Microsoft, the entire functioning of the U3 was likely to be blocked in the new Vista system. While this would prevent viruses from auto-launching in Vista, it would also prevent the U3 from functioning as anything other than a basic storage device.

would not pay. SanDisk began offering up unsupported excuses. Plaintiffs were told that the U3 used standard SanDisk firmware, that the U3 DIDs were not derived from MDRM's BookLocker DIDs, and that all the U3 security features were derived from M-Systems. Not only did these excuses lack any basis in reality, but they were a complete about-face from all representations and acknowledgements previously made by SanDisk executives.

29.     SanDisk then offered Harkabi and Elazar each $400,000.00 (totaling $800,000.00) in lieu of the $4 million owed under the Contract. Plaintiffs refused to accept the offer and continued to insist upon payment of the full amount.

30.     A few months later, and in the midst of continued discussion about the payment of the earn out, Harkabi and Elazar were fired. In February 2007, they learned that SanDisk was eliminating their jobs purportedly as part of a reduction in force. While this RIF was designed to eliminate 10% of SanDisk employees, SanDisk attempted to terminate more than 55% of the SCS team. After strong objection from Harkabi, SanDisk relented and terminated only 35% of the team. Harkabi was the only senior-level employee across the entire company terminated by the RIF.

31.     In addition to firing plaintiffs after they raised concerns about the U3 and refused to accept the discounted earn out payment, SanDisk required plaintiffs to execute a release of all claims, including claims relating to the earn out dispute, in order to receive a severance package similar to that being offered other RIF'd employees. Plaintiffs refused to sign this broad release. As a result, they received two weeks of severance while other RIF'd employees received severance of 6 months or more.[7]

---

[7] As SanDisk was aware, Harkabi and Elazar are foreign nationals who had been working in the United States on visas sponsored by SanDisk. Thus, by firing them, SanDisk has forced them to return to Israel, and plaintiffs must now litigate this case from thousands of miles away.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT AS TO SANDISK CORPORATION

32. Plaintiffs reallege and incorporate by reference, paragraphs 1-31 as if set forth fully herein.

33. SanDisk's actions, including, but not limited to the following, constitute a breach of the Contract:

    A. SanDisk's refusal to pay the full earn out; and

    B. SanDisk's refusal to honor the "Best Efforts" clause of the Contract; and

    C. SanDisk's refusal to properly market the Cruzer; and

    D. SanDisk's refusal to dedicate sufficient marketing resources to the promotion of MDRM units as required by the Contract.

34. As a result, plaintiffs were damaged by SanDisk's breach of the Contract in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO SANDISK CORPORATION

35. Plaintiffs reallege and incorporate by reference, paragraphs 1-31 as if set forth fully herein.

36. SanDisk engaged in conduct, separate and apart from the performance of obligations under the Contract, without good faith and for the purpose of depriving the plaintiffs, of rights and benefits under the Contract, that constitutes a breach of the implied covenant of good faith and fair dealing.

37. As a result, plaintiffs have been damaged by SanDisk's conduct in an amount to be determined at trial.

V. **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment in their favor, and against defendant, as follows:

    A. requiring that defendant pay to plaintiffs damages on each and every Cause of Action stated herein, in an amount to be determined at trial;

    B. requiring that defendant pays to plaintiffs pre-judgment and post-judgment interest at the maximum rate allowed by law;

    C. requiring that defendant reimburse plaintiffs for all attorneys' fees, costs and disbursements incurred by plaintiffs in this action; and

    D. awarding to plaintiffs such other, further and different relief as the Court may deem just and equitable.

Dated: September 23, 2008

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

Charles A. Stillman (CS-0154)
James A. Mitchell (JM-4150)
Daniel V. Shapiro (DS-7677)
425 Park Avenue, 26th Floor
New York, NY 10022
(212) 223-0200

*Attorneys for Plaintiffs*
*Dan Harkabi & Gidon Elazar*