UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
DAN HARKABI,                              :    Index No.: 08-CV-8203(WHP)(THK)
GIDON ELAZAR,                             :
                                          :
                 Plaintiffs,              :
                                          :
         vs.                              :
                                          :
SANDISK CORPORATION,                      :
                                          :
                 Defendant.               :
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SANCTIONS
AGAINST DEFENDANT SANDISK FOR SPOLIATION**


STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
425 Park Avenue
New York, New York 10022
(212) 223-0200

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.  SanDisk acquires MDRM in 2004 and promises an earn-out.......................... 2

II.  Harkabi and Elazar join SanDisk and incorporate MDRM technology into the U3. ...... 3

III.  SanDisk issues litigation hold memos and secures the Harkabi and Elazar laptops. ...... 6

IV.  SanDisk fails to produce the contents of the Harkabi or Elazar laptops for this litigation. ................................................................................................... 7

V.  Elazar's analysis reveals that much of Harkabi and Elazar's e-mail is missing. ........... 10

ARGUMENT ........................................................................................................... 12

I.  SanDisk spoliated important evidence when it had a clear preservation obligation...... 13

A.  SanDisk has admitted it spoliated the hard drives. ................................. 13

B.  SanDisk has spoliated large amounts of Harkabi and Elazar's e-mail. .............. 14

II.  SanDisk acted with a culpable state of mind when it spoliated the evidence............... 17

III.  The record establishes that the destroyed evidence was relevant. ................................ 19

A.  SanDisk's bad faith or gross negligence establishes the evidence was relevant... 20

B.  SanDisk's discovery conduct further establishes the relevance of the evidence. . 20

C.  Harkabi and Elazar's affidavits establish the evidence was relevant................... 22

IV.  SanDisk should be severely sanctioned for its spoliation of key evidence................... 23

A.  Summary judgment for plaintiffs is warranted. ..................................... 24

B.  At a minimum, the Court should impose an adverse inference. ........................... 24

C.  In any event, SanDisk should pay for the costs resulting from its spoliation....... 25

CONCLUSION ......................................................................................................... 25

Federal Cases

*Byrnie* v. *Town of Cromwell*, 243 F.3d 93 (2d Cir. 2001). ........................................................... 20

*Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048, 2005 WL 1925579
(S.D.N.Y. August 11, 2005) ............................................................................................ 22, 25

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062
(2d Cir. 1979)..................................................................................................................... 24, 25

*De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2007 WL 1686327 (S.D.N.Y.
June 6, 2007)....................................................................................................................... 13, 24

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (S.D.N.Y. 1997)................................................................ 18

*Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423 (2d Cir. 2001)................................................. 12

*Gates Rubber Co. v. Bando Chemical Indus., Ltd.,* 167 F.R.D. 90 (D. Colo. 1996) ................... 23

*Gutman v. Klein*, No. 03 CV 1570, 2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008). .......... 13, 24, 25

*In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179 (S.D.N.Y. 2007) ....................................................... 22

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) ............................................................... 19

*Miller v. Time-Warner Commc'ns, Inc.,* No. 97 Civ. 7286, 1999 WL 739528
(S.D.N.Y. Sept. 22, 1999) ....................................................................................................... 24

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976). .................................... 13

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002)......... passim

*Shaffer v. RWP Group, Inc.*, 169 F.R.D. 19 (E.D.N.Y. 1996) ...................................................... 23

*Treppel v. Biovail Corp.*, 233 F.R.D. 363 (S.D.N.Y. 2006)........................................................... 22

*Turner v. Hudson Transit Lines*, 142 F.R.D. 68 (S.D.N.Y. 1991). ............................................... 24

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (2d Cir. 1999) ............................................ 12

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ("*Zubulake IV*") ................... 13

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ("*Zubulake V*")............... 17, 18

Federal Rules

Fed.R.Civ.P. 26(a)(1)(A)(i) ............................................................................................................. 12

Fed.R.Civ.P. 34(a) ........................................................................................................................... 12

Fed.R.Civ.P. 37................................................................................................................................ 11

**INTRODUCTION**

This is a breach of contract claim brought by Dan Harkabi and Gidon Elazar against SanDisk. In September 2004, Harkabi, Elazar, and SanDisk entered into a contract whereby SanDisk acquired MDRM, Harkabi and Elazar's former company, with a portion of the purchase price to be paid as a $4 million earn-out based on SanDisk's sale of products that use MDRM's technology or any derivative. As part of the deal, Harkabi and Elazar went to work for SanDisk. During their employment, Harkabi and Elazar incorporated the MDRM technology into a new SanDisk product. Harkabi and Elazar prepared extensive documentation of their work on the product, including detailed notes, communications, and records of meetings, on SanDisk-issued laptop computers that they used as employees. The product's sales easily triggered the full earn-out. Harkabi and Elazar requested that SanDisk pay the full earn-out, and at a meeting with SanDisk senior executives, the company agreed. SanDisk, however, soon reversed its position and refused to pay the full earn-out. Elazar made notes on his laptop about this meeting and the follow-up communications. After Harkabi and Elazar continued to press for payment, they were fired. Harkabi and Elazar immediately sent a litigation hold letter.

After an unsuccessful mediation, Harkabi and Elazar brought this action in September 2008 asserting a breach of contract claim based mainly on SanDisk's failure to pay the full earn-out. As discovery proceeded, Harkabi and Elazar suspected that SanDisk was not producing important documents that Harkabi and Elazar knew existed on their laptops at SanDisk. For months, SanDisk misled Harkabi and Elazar about the omissions in its document production. When pressed, however, SanDisk — one of the world's largest suppliers of data storage products — eventually *admitted* that in April 2008, well after issuing the litigation hold, it had erased the contents of the laptops and could not locate any of the backup copies supposedly preserved

1

before erasing the laptop contents. Compounding this lost-evidence problem, an analysis of SanDisk's production strongly suggests that SanDisk has not produced other important evidence — the custodial files for Harkabi and Elazar's e-mail that should exist on SanDisk's systems. SanDisk has been unable, or unwilling, to explain what happened to the missing e-mail.

As a sanction for this conduct, plaintiffs respectively request that the Court issue an order granting them summary judgment — or at a minimum, imposing an adverse inference and precluding SanDisk from introducing certain evidence — and further order SanDisk pay the costs resulting from its actions.

STATEMENT OF FACTS[1]

## I.     SanDisk acquires MDRM in 2004 and promises an earn-out.

In 2002, Dan Harkabi and Gidon Elazar formed a company called MDRM, collectively owning 92.46% of the stock. (Harkabi ¶2) The company developed a significant advancement in computer flash drive technology (the "MDRM technology") which allowed consumers to access secure or copyrighted content from the Internet — such as books, music, or video — and load it onto a device in a way that satisfied the copyright protection needs of publishers. (*Id.*) MDRM technology allowed firmware — *i.e.*, software embedded in a hardware device — to be downloaded to a flash drive in a manner that securely controls the use of the material being downloaded. (*Id.*) MDRM created a product that incorporated this technology called Booklocker, which enabled students to download textbooks securely onto a flash drive. (*Id.*)

---

[1] The facts recited here are set forth in the accompanying affirmation of plaintiffs' counsel Charles A. Stillman (cited as "Stillman ¶_") and in affidavits of plaintiffs Dan Harkabi and Gidon Elazar (cited as "Harkabi ¶_" and "Elazar ¶_"). The declarations SanDisk has produced of Julie Liedtke (Stillman, Ex. 9), Scott Dillon (Stillman, Ex. 14), and Gurpreet Sahni (Stillman, Ex. 15) are cited here as "Liedtke ¶_," "Dillon ¶_," and "Sahni ¶_."

SanDisk acquired MDRM in 2004. The deal included an "earn-out" provision that was to pay MDRM shareholders up to $4 million if SanDisk sold 3.2 million or more products that incorporated the MDRM technology, or any "derivative" of that technology, by December 2006. (Harkabi ¶3) The term "derivative" was broadly defined under the contract to include "any …concept, in any medium, format or form whatsoever, that is derived in any manner, directly or indirectly, from the MDRM Technology." (Harkabi, Ex. 1 at 5)

## II.     Harkabi and Elazar join SanDisk and incorporate MDRM technology into the U3.

Harkabi and Elazar became SanDisk employees as part of the acquisition of MDRM. They were given SanDisk laptops, smart-phones, and e-mail accounts, which they used throughout their employment. (Harkabi ¶4, Elazar ¶2) Harkabi and Elazar's e-mail resided on a SanDisk e-mail server that they accessed from their SanDisk laptops or smart-phones, or through a remote access application. (*Id.*) As their regular practice, Harkabi and Elazar made notes related to their work on their SanDisk laptops, which they would also often e-mail to themselves or save as draft e-mails in their e-mail accounts. (*Id.*) They also would frequently send e-mails to each other regarding their work. (*Id.*)

In 2005, Carlos Gonzalez, SanDisk's Director of Firmware and Software Development, was leading a team developing a product called the U3. The U3 is "a mobile computing platform that allows you to carry your applications on a USB drive and launch them on any PC. So wherever you go – your office or home, an internet café or business centre – you can take your favourite software as well as your data files." Frequently Asked Questions about U3, http://apac.sandisk.com/Retail/Default.aspx?CatID=1450 (last visit Nov. 10, 2009). Similar to the way Booklocker allowed for the secure download of textbooks, the U3 device was intended to allow for the secure download of applications. (Elazar ¶3) When difficulties arose in the U3

development process, in about May 2005, Gonzalez asked Harkabi and Elazar to help fix the U3 by incorporating MDRM's technology into the device. (Elazar ¶3)

At the heart of both the Booklocker and U3 technologies is the requirement to produce flash drives with unique identification numbers and secret encryption codes so that a content provider can keep track of who has an authorized copy of a purchased book or authorize the usage of an application. (Elazar ¶4) The U3 team had intended to use a technology from a vendor called Discretix to manufacture devices with unique identification numbers, but the technology did not work within the time frame for product launch. (*Id.*) That is when Carlos Gonzalez came to Harkabi and Elazar for their help. (*Id.*) He asked them to show his team how to implement the MDRM approach to manufacturing devices with unique identification numbers using "golden keys." (*Id.*) Elazar worked with Carlos Gonzalez and the entire U3 manufacturing team to teach them how to implement a derivative of the MDRM technology. (*Id.*) Several months later, U3 devices with MDRM's technology began to roll off the production line. (*Id.*) Ultimately, SanDisk sold far more than the 3.2 million units that entitled Harkabi and Elazar to the full earn-out under their contract with SanDisk. (*Id.*)

The meetings with Gonzalez and the other members of the various U3 teams were recorded in notes that Elazar made on his SanDisk laptop. (Elazar ¶5) At these meetings, the progress of incorporating the MDRM technology into the U3 was specifically discussed. (Harkabi ¶7, Elazar ¶5) During some of the meetings, Elazar drew technical schematics on a white board to explain the process to the SanDisk team. (Elazar ¶5) As was his standard practice, he photographed the whiteboard schematics and stored images of them on his laptop. (*Id.*) Harkabi and Elazar's computers and e-mail accounts also contained detailed e-mail conversations and calendars that tracked their involvement and assistance to the U3 team in

incorporating the MDRM technology. (Harkabi ¶7, Elazar ¶5) Furthermore, Gonzalez would take notes during these meetings in a black and white composition notebook. (*Id.*)

In approximately September 2006, a meeting was held to discuss whether Harkabi and Elazar were entitled to the earn-out for their work relating to the U3. (Elazar ¶6) In attendance were Eli Harari, SanDisk's CEO, and other top management at SanDisk, including Yoram Cedar (SVP Engineering), Rich Chernicoff (VP Business Development and SanDisk's representative to negotiate MDRM's acquisition), Megan Comport (VP and Associate General Counsel), and Sanjay Mehrotra (COO). (*Id.*) During the meeting, Harkabi and Elazar made a presentation explaining how the U3 employs the MDRM technology. (*Id.*) As the meeting concluded, Chernicoff stated that in accordance with the contract, SanDisk should pay the full earn-out. (*Id.*) Chernicoff then directed Comport to get a check cut for the respective portion of the full earn-out destined to S-COM Ltd, one of MDRM's shareholders. (*Id.*) Chernicoff had planned to visit S-COM, which is located in Singapore, the following week. (*Id.*) Elazar later recorded notes on his laptop memorializing the decisions reached at the meeting — including SanDisk's determination that Harkabi and Elazar were entitled to the earn-out. (*Id.*)

After the meeting, SanDisk's CEO, Harari, privately asked Harkabi and Elazar about concerns he had heard they had about the development of the U3 (which were unrelated to the implementation of the MDRM technology in the U3). (Elazar ¶7) They told Harari about their concerns. (*Id.*) Later that night, an extremely angry Yoram Cedar called Harkabi and complained that he had been yelled at by Harari regarding the deficiencies pointed out by Harkabi and Elazar. (Harkabi ¶9) Approximately two weeks later, Cedar informed Harkabi and Elazar that they needed to discuss the earn-out with Megan Comport. (Elazar ¶7) Harkabi and Elazar were ultimately advised that SanDisk had reversed its position entirely and would refuse to pay the

balance of the earn-out. (*Id.*) Instead, SanDisk offered to pay Harkabi and Elazar each $50,000 per quarter for 8 quarters (totaling $800,000). (*Id.*) Harkabi and Elazar declined SanDisk's proposal. (*Id.*) Harkabi and Elazar maintained notes and exchanged e-mail among themselves regarding these events. (*Id.*)

### III. SanDisk issues litigation hold memos and secures the Harkabi and Elazar laptops.

With a dispute brewing, in March 2007, SanDisk fired Harkabi and Elazar. (Harkabi ¶10, Elazar ¶8) At the time they were fired, Harkabi and Elazar's SanDisk-issued laptops worked properly, and their e-mail resided on the SanDisk e-mail server. (*Id.*) On March 7, 2007, Harkabi and Elazar's counsel sent SanDisk a document preservation letter. (Stillman, Ex. 1) The letter stated that SanDisk was "in breach of its obligation to pay the full amount of the earn-out provision of the Amended and Restated Stock Purchase Agreement" and invoked the arbitration clause under the agreement. (*Id.*) The letter set forth various categories and sources of evidence relevant to the dispute, including "all email, documents and computers (including laptops) of Messrs. Harkabi [and] Elazar," and instructed SanDisk to preserve the material. (*Id.*)

The day after the document preservation letter was sent, Scott Dillon, SanDisk's Director of Global Operations, received an e-mail from in-house counsel Megan Comport instructing him to preserve the Harkabi and Elazar laptops. (Dillon ¶8) Dillon then instructed Gurpreet Sahni, a Help Desk employee, to secure these laptops. (Sahni ¶8) Sahni placed Harkabi and Elazar's laptops in a supposedly secured storage area. (*Id.*) On April 12, 2007 — more than a month after receiving the document preservation letter — in-house counsel Comport issued four "Do-Not-Destroy Memos" to SanDisk employees relating to various categories of documents relevant to the dispute with Harkabi and Elazar. (Liedtke ¶8)

A year later in April of 2008, Help Desk employee Sahni contacted Michael Podobnik, SanDisk's Director of Information Security, and asked if he could delete and reissue Harkabi and Elazar's laptops (which were housed in the "secure" area). (Sahni ¶10) Sahni's "understanding" is that Podobnik forwarded his request to SanDisk's Legal Department and received the Legal Department's approval — despite the litigation hold — to erase the hard drives. (*Id.*) No document has been produced supporting this "approval." Sahni claims that he then imaged the laptops and saved those images on a SanDisk file server located at SanDisk headquarters. (Sahni ¶11) According to SanDisk, these file servers are backed up five times a week, with four incremental backups during the week, and one full backup on the weekend. (Dillon ¶6) Tapes of full backups are to be preserved indefinitely. (*Id.*) SanDisk, a multi-billion dollar company, has not explained why it needed to delete and reissue these two particular laptop computers.

IV.     **SanDisk fails to produce the contents of the Harkabi or Elazar laptops for this litigation.**

On September 24, 2008 Harkabi and Elazar filed their complaint. (Stillman, Ex. 2) In October 2008, Julie Liedtke, in-house counsel at SanDisk, contacted plaintiffs to request an extension of time for SanDisk to file its answer, and the parties signed a stipulation for an extension on October 14. (Stillman, Ex. 3) On December 31, 2008, plaintiffs served a document request on SanDisk that requested various categories of documents and instructed SanDisk to identify if any responsive document that was at one time in the possession of SanDisk "has been lost, stolen, discarded or destroyed." (Stillman, Ex. 4)

In February 2009, SanDisk conducted a manual search of "the twelve file servers where plaintiffs' laptop images had likely been stored." (Dillon ¶11) Over the next several months, "multiple smaller-scale reviews of the same servers were conducted." (Dillon ¶12) SanDisk did not locate copies of Harkabi and Elazar's laptop hard drives. (Dillon ¶14)

On February 11, 2009, the parties met and conferred regarding a discovery protocol for the search of electronic documents. (Stillman ¶4) During the meeting, plaintiffs' counsel requested that SanDisk provide a search term report indicating the number of hits for each proposed search term, so that the parties could work together to narrow terms as necessary. (*Id.*) Plaintiffs' counsel reiterated this proposal in an e-mail sent later the same day. (Stillman, Ex. 5)

On April 14, plaintiffs contacted SanDisk's counsel after receiving the first and only search term report. That report indicated that the search term "Elazar" only returned five hits when searching Gidon Elazar's e-mail and that no e-mail was found for Dan Harkabi. (Stillman ¶5) In response, SanDisk's counsel advised that "when an employee leaves the company, he typically returns his computer/lap top [sic] and the device gets recycled 30 days later. The information on the device is supposed to be transmitted before it is emptied but it is possible this did not occur with the four custodians you've identified, which includes Mr. Harkabi." (Stillman, Ex. 6) SanDisk did not disclose that the laptops had been secured for a year, then supposedly imaged before being erased. (*Id.*) SanDisk also did not disclose that an extensive search for the contents of the hard drives had been entirely unsuccessful. (*Id.*) Two days after receiving this response, plaintiffs served a Rule 30(b)(6) deposition notice on SanDisk on topics relating to the preservation of documents and whether documents had been destroyed. (Stillman, Ex. 7)

As a result of negotiation with SanDisk, plaintiffs agreed to adjourn the 30(b)(6) deposition subject to SanDisk providing a sworn statement from an employee with knowledge attesting to SanDisk's compliance with Harkabi and Elazar's March 7, 2007 document preservation letter. (Stillman, Ex. 8) SanDisk then furnished a declaration from in-house counsel Liedtke, which attested: "I have no reason to believe that the four 'Do-Not-Destroy' Memoranda issued on April 12, 2007, were not fully complied with by SanDisk and its employees, temporary

employees, and contractors." (Liedtke ¶9) Again, no mention was made of the deleted laptops and unsuccessful search for the materials.

On May 22, 2009, plaintiffs served SanDisk with a specific request for copies of the hard drives from Harkabi and Elazar's SanDisk-issued laptops. (Stillman, Ex. 10) While awaiting SanDisk's response, in June 2009 SanDisk agreed to produce "everything" returned by plaintiffs' previously proposed search terms. (Stillman ¶7) As a result, on June 18, SanDisk provided plaintiffs with a massive production of electronic materials that included well over a million documents. (Stillman ¶7, Elazar ¶10) In a June 22, 2009 written response to Harkabi and Elazar's May request for the copies of the hard drives, SanDisk declined to produce the hard drives, stating that "all electronic documents from [the] hard drive[s] that are relevant to this dispute have already been produced." (Stillman, Ex. 11) So, as far as plaintiffs had then been told, they needed only to search SanDisk's native production to find the materials from Harkabi and Elazar's laptops and e-mail files.

After receiving estimates of several hundred thousand dollars from vendors to load the native documents into a review system, Harkabi and Elazar built their own document review system. (Elazar ¶9) Harkabi, Elazar, and their counsel expended significant expense and effort to evaluate SanDisk's native production but could not find *any* of the materials that Harkabi and Elazar knew to be on the laptop hard drives. (Harkabi ¶11, Elazar ¶9, Stillman ¶8) There were also significant amounts of e-mail missing from the custodian files of Harkabi and Elazar. (Elazar ¶9) Finally, on July 28, after repeated discussions, counsel for SanDisk for the first time acknowledged during a phone call that information from the hard drives had not been included in the native production, saying SanDisk continued to look for them. (Stillman ¶8)

In August 2009, SanDisk conducted additional searches for the hard drives, including a review of a catalog of backup tapes and an index of all available laptop images. (Dillon ¶13) On August 18, plaintiffs sent a letter to SanDisk about the missing hard drives and the omission from SanDisk's production of the custodian files of Harkabi and Elazar, highlighting the small amounts of their e-mail actually produced. (Stillman, Ex. 12) On September 10, 2009 SanDisk's counsel *finally* admitted that SanDisk had been unable to locate the laptop hard drives; nonetheless, SanDisk's counsel still did not respond to any of plaintiffs' concerns regarding their missing e-mail. (Stillman, Ex. 13) On September 22, SanDisk provided plaintiffs with declarations from Scott Dillon and Gurpreet Sahni, describing the steps SanDisk supposedly had taken to locate the hard drives. (Stillman ¶9, Exs. 14 & 15) To date, SanDisk has not found the hard drives and "has been unable to determine why plaintiffs' laptop images were not contained on either the SanDisk servers or the SanDisk backup tapes." (Dillon ¶14)

**V.      Elazar's analysis reveals that much of Harkabi and Elazar's e-mail is missing.**

Elazar has spent months analyzing the data contained in SanDisk's June 2009 native production. (Elazar ¶10) In that entire native production, SanDisk produced only 3,004 e-mails that it claimed came from Harkabi's custodian file and only 2,270 e-mails from Elazar's (numbers which include many duplicate e-mails). (*Id.*) These represent a small fraction of the e-mails that Harkabi and Elazar sent during their two years of employment at SanDisk. (*Id.*) Elazar also analyzed the entire native production across all 21 custodians (over 1.4 million documents) to attempt to piece together Harkabi and Elazar's e-mail. (*Id.*) His analysis indicated that, when duplicates are removed, the entire native production contains only 6,974 unique e-mails for Harkabi and only 6,258 unique e-mails for Elazar. (*Id.*)

Elazar also searched across the entire database and compared the number of unique e-mails produced for other custodians (when duplicates are removed) to those produced for Harkabi and Elazar. The results were as follows: Judy Bruner (75,790), Yoram Cedar (51,608), Kevin Zhang (49,978), Steve Needels (44,703), Andy Tomlin (44,052), Mike Morganstern (42,089), Carlos Gonzalez (38,885), Sanjay Mehrotra (35,373), Nelson Chan (25,800), Eli Harari (22,637), Orna Sarfaty (20,946), Sean Chang (19,370), Tony Ahwal (18,944), Micky Holtzman (14,642), Richard Chernicoff (13,692), Vladimir Zininberg (9,643), Dan Harkabi (6,974), Gidi Elazar (6,258), Megan Comport (5,886), Avi Shmuel (4,696), Cathy Lego (539). (Elazar ¶ 11) Ultimately, Elazar's analysis found that SanDisk produced far less e-mail for Harkabi and Elazar than for almost all of the other custodians. (*Id.*) Elazar also found that approximately only half of the documents analyzed in a test subset contained one or more of the search terms that SanDisk agreed to use to limit their native production. (*Id.*)

Elazar further identified other discrepancies in SanDisk's production that suggest it had not actually produced Harkabi and Elazar's e-mail files, but rather had attempted to piece together Harkabi and Elazar's e-mail from other sources. (Elazar ¶12) Elazar found that the SanDisk native production contained no e-mails solely between Harkabi and Elazar. (*Id.*) The analysis also found no e-mails sent from Harkabi to himself or from Elazar to himself even though this was their common practice. (*Id.*) Elazar compared plaintiffs' production — which contained a small number of e-mails provided to plaintiffs' counsel before Harkabi and Elazar were fired — to SanDisk's native production and found several examples of e-mails produced by plaintiffs that were not contained in the SanDisk production. (*Id.*, Exs. 2-14) Elazar also found examples of e-mails produced from what SanDisk indicated was Harkabi or Elazar's custodian files that were from after they had left SanDisk and were sent to them at a subsequent company.

(*Id.*, Exs. 15-18) All of these holes in the production indicate that SanDisk did not produce Harkabi and Elazar's e-mail as it resided on the e-mail server and that, instead, SanDisk attempted to piece it back together. (Elazar ¶12)

## ARGUMENT

This Court has authority to sanction a party that breaches a discovery obligation under both Federal Rule of Civil Procedure 37 and the Court's inherent power. *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002). Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). The Court has wide discretion in determining the appropriate sanction for spoliation on a case-by-case basis. *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

Sanctions for spoliation are warranted when the movant shows three elements: obligation, culpability, and relevance. *See Residential Funding*, 306 F.3d at 107. The *obligation* element is established by showing that the party with control over the evidence in question had a legal duty to preserve it at the time it was destroyed. *Id. Culpability* is established by showing that the evidence was destroyed with a culpable state of mind. *Id. Relevance* is established by showing that a reasonable trier of fact could determine that the destroyed evidence would support the movant's claim or defense. *Id.*

Terminating sanctions, such as summary judgment, may be imposed when there is bad faith or gross negligence. *De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2007 WL 1686327, at *3 (S.D.N.Y. June 6, 2007). Indeed, lesser sanctions may be ill-suited to a case where the spoliator has "in bad faith, irretrievably deleted computer files that likely contained

important discovery information." *Gutman v. Klein*, No. 03 CV 1570, 2008 WL 4682208, at \*12 (E.D.N.Y. Oct. 15, 2008). Terminating sanctions are intended not just as a penalty but "to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

## I.      SanDisk spoliated important evidence when it had a clear preservation obligation.

A party's obligation to preserve evidence begins "when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436. This obligation to preserve extends to "any documents or tangible things (as defined by Rule 34(a)) made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses.'" *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003) ("*Zubulake IV*") (quoting Fed.R.Civ.P. 26(a)(1)(A)(i)).

There can be no dispute that SanDisk's preservation obligation arose, at the latest, upon their receipt of Harkabi and Elazar's March 7, 2007 preservation letter. The letter — written at the time SanDisk terminated the plaintiffs' employment — put SanDisk on notice that there would be future litigation. The letter identified numerous categories of evidence relevant to the dispute, specifically including "all email, documents and computers (including laptops) of Messrs. Harkabi [and] Elazar," and instructed SanDisk to preserve the material. (Stillman, Ex. 1) Because Harkabi and Elazar were undoubtedly two of the "key players" in the dispute, SanDisk was under an obligation to preserve their materials. *See Zubulake IV*, 220 F.R.D. at 218.

### A.      SanDisk has admitted it spoliated the hard drives.

In September 2009, one year after the complaint was filed — and after eight months of discovery disputes — SanDisk admitted it had spoliated the hard drives. The Dillon and Sahni

declarations indicate that as late as April of 2008, SanDisk had the laptop hard drives in its possession. Sahni states that at the time, it was his "understanding" that the legal department had approved his request to delete the laptops. (Sahni ¶10) SanDisk, however, has not provided a declaration (or any document) from anyone explaining how or why permission was granted to delete the laptops.

Sahni claims that he imaged the Harkabi and Elazar laptop hard drives and saved those images on a SanDisk file server located at SanDisk headquarters. Given SanDisk's weekly backup system, there should be multiple backup copies of the contents of the hard drives — regardless of SanDisk's inexplicable deletion of the original contents. Nevertheless, and despite Sahni's representation that he saved copies on the server, SanDisk has been unable to find any image of the hard drives on either the SanDisk file server or backup tapes. As a result, SanDisk's conduct has caused evidence of great significance to plaintiffs' case to disappear.

**B.      SanDisk has spoliated large amounts of Harkabi and Elazar's e-mail.**

Separate from SanDisk's spoliation of evidence from Harkabi and Elazar's laptops, it also failed to produce large amounts of Harkabi and Elazar's e-mail from their employment at the company which should exist in its internal systems. As detailed above, Elazar's extensive analysis of SanDisk's native production indicates that a significant amount of Harkabi and Elazar's e-mail appears to be missing. Elazar used three methods for this analysis: (1) a comparison of the total number of e-mails produced for Harkabi and Elazar as compared to other custodians, (2) an analysis of the e-mails that SanDisk claims came from Harkabi and Elazar's custodian files, and (3) a comparison which shows that e-mails produced by plaintiffs do not appear in SanDisk's production.

*First*, the number of e-mails from Harkabi and Elazar that SanDisk produced is too low. As detailed in Elazar's affidavit, SanDisk produced just over 6,000 e-mails for each of Harkabi and Elazar while producing tens of thousands of e-mails for other custodians. SanDisk's production was supposed to be the result of running a series of search terms against the custodian files of a number of SanDisk personnel, including plaintiffs. Not surprisingly, two of the search terms employed were the plaintiffs' last names — a means of ensuring production of any e-mail to which plaintiffs were a sender, recipient, or "cc" because their SanDisk e-mail addresses included their last names. (Elazar, Ex. 1) Despite those search terms, SanDisk produced more e-mail for 16 of the 19 other custodians than they did for Harkabi and Elazar themselves.

*Second*, the e-mails that SanDisk claims came from Harkabi and Elazar's custodian files suggest a suspect process. A review of these e-mails indicates that this production was pieced together from other custodians' e-mail rather than from a proper preservation of evidence. Several observations from SanDisk's production support this conclusion. None of the e-mails produced are solely between Harkabi and Elazar. Additionally, there are no e-mails sent from Harkabi to himself or from Elazar to himself — even though this was a usual practice that each used to track important events related to their work. Furthermore, SanDisk produced e-mails which it indicated came from Harkabi or Elazar's custodian files that were generated long after Harkabi and Elazar were no longer at SanDisk. (These e-mails were sent by SanDisk employees to Harkabi and Elazar at e-mail addresses used at their subsequent company.) Each of these observations strongly suggest that SanDisk — having inexplicably lost electronic evidence from Harkabi and Elazar's custodian files — simply ran a search for Harkabi and Elazar's names across the other custodians files and then presented the results as if coming from Harkabi and Elazar's custodian files. This approach, of course, would mean that SanDisk has only produced

Harkabi and Elazar e-mails contained in the other custodians files. Much appears to have gone missing — including all e-mail solely between Harkabi and Elazar, e-mail each sent to individuals not on the custodian list, e-mail each sent to himself, and all e-mail that Harkabi and Elazar kept because they thought it important but others custodians may have deleted.

*Third*, plaintiffs' own production corroborates that SanDisk has not met its discovery obligations. When they were fired, plaintiffs did not preserve images of their files (some of which may have contained proprietary material of SanDisk), believing that SanDisk would preserve their files. Nevertheless, before they were fired, Harkabi and Elazar forwarded a handful of relevant e-mails to their counsel, and plaintiffs have produced the documents in this litigation. Several of these e-mails that once existed on SanDisk's system — on both the company's e-mail server and weekly backup tapes — do not appear in SanDisk's productions. (Elazar, Exs. 2-14) Those e-mails should have been on the company's e-mail server as well as any of the weekly backup tapes.

Finally, Harkabi and Elazar's e-mail resided on a central e-mail server and SanDisk should have been able to retrieve the e-mail independently of whether they recovered their laptops. This e-mail should have been preserved when Harkabi and Elazar were fired from the company in March of 2007. Notably, the declaration SanDisk provided from in-house counsel Julie Liedtke — meant to describe SanDisk's compliance with a litigation hold — makes no mention of an attempt to preserve Harkabi and Elazar's e-mail from the server. Similarly, SanDisk does not explain how it managed to lose weekly backup copies that would have been made of Harkabi and Elazar's e-mail during their two years of employment there.

All of the circumstances lead to one conclusion: SanDisk spoliated Harkabi and Elazar's e-mail after the issuance of the March 7, 2007 preservation letter.

**II.     SanDisk acted with a culpable state of mind when it spoliated the evidence.**

The culpable state of mind requirement can be met if evidence is destroyed either knowingly, even with no intent to breach a preservation obligation, or negligently. *Residential Funding Corporation*, 306 F.3d at 108. Here, SanDisk's in-house counsel failed to adequately supervise and implement a litigation hold. SanDisk has proffered three declarations attempting to explain why evidence went missing. These declarations establish SanDisk's culpable state of mind.

SanDisk's in-house counsel Megan Comport was aware of the company's obligation to preserve evidence; indeed on March 8, 2007, she instructed that Harkabi and Elazar's laptops should be preserved. (Dillon ¶8) Nonetheless, SanDisk waited over a month after receiving a litigation hold letter on March 7, 2007, to issue any kind of "Do-Not-Destroy" memo. (Liedtke ¶9) Incredibly, SanDisk has offered no explanation for waiting a month to issue the hold memos. Another SanDisk declarant, Liedtke, states that she has no reason to believe that the memos were not complied with, but she provides no indication of any affirmative steps that SanDisk in-house counsel took to ensure compliance. (Liedtke ¶9) SanDisk thus never explains — and we may never know — what destruction took place in the month before SanDisk issued the "Do-Not-Destroy" memos.

The obligations of SanDisk's in-house counsel did not end with the implementation of a litigation hold. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("*Zubulake V*"). It is counsel's obligation to "oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." *Id.* Fulfilling that obligation will "invariably involve speaking with information technology personnel." *Id.* Notably absent from Liedtke's description of "Document Preservation in this Litigation" is any mention

of working with SanDisk's information technology group to preserve Harkabi and Elazar's e-mails from the server. Moreover, in-house counsel did not adequately supervise the Help Desk employee Sahni, who was given possession of key evidence in this case. Such failures to communicate frequently lead to the loss of important information. *See e.g., Zubulake V*, 229 F.R.D. at 434 ("One of the primary reasons that electronic data is lost is ineffective communication with information technology personnel."). SanDisk in-house counsel could have safeguarded the information by taking possession of the laptop hard drives instead of leaving them in the possession of non-legal personnel. Moreover, if Sahni's "understanding" was correct — that SanDisk's legal department actually approved deleting the laptop hard drives — counsel's conduct here goes well beyond negligent oversight of the preservation of the laptops.

Indeed, SanDisk's sophistication in the field of data storage supports a finding that the destruction of evidence was grossly negligent or even intentional. SanDisk is a self-professed "internationally recognized authority on non-volatile memory technology." About SanDisk, http://www.sandisk.com/about-sandisk (last visit Nov. 16, 2009). Yet, its own employees were unable to backup two laptop hard drives. SanDisk is in the business of making sure data storage is handled properly, and, as a result, its failure to do so in a lawsuit against it is made more egregious. *See e.g. Donato v. Fitzgibbons*, 172 F.R.D. 75, 80 (S.D.N.Y. 1997) ("The failure of defendant [Police Department] to safeguard this evidence is even more egregious because the [defendant] is, or should be, in the business of insuring that evidence is handled properly.").

SanDisk's inability to locate the contents of the laptop hard drives on any of its servers or backup systems strongly suggests that this evidence was never backed up at all. As SanDisk's Scott Dillon describes, the SanDisk servers are backed up five times a week, with four incremental backups during the week and one full backup on the weekend, which is kept

indefinitely. Yet, there appears to be no trace of the Harkabi or Elazar laptop hard drives on the approximately 75 or more weekly backup tapes made since April 2008, when Sahni states he backed up the laptop hard drives. The compelling inference is that Sahni never backed up the laptops, thereby "knowingly" destroying the evidence, whether or not he had the specific intent of violating a preservation obligation. *See Residential Funding*, 306 F.3d at 108. The alternative explanation is unlikely — that SanDisk's multiple systems "accidentally" failed, thereby deleting plaintiffs' laptop hard drive images from its server and all backup tapes while all other data remained unaffected. The record here overwhelmingly establishes that evidence is missing as a result of SanDisk's gross negligence or, even worse, intentional acts.

### III. The record establishes that the destroyed evidence was relevant.

Where the spoliator acted in bad faith, that alone is sufficient to establish the relevance of the unavailable evidence. *Residential Funding*, 306 F.3d at 109. Likewise, a spoliator's gross negligence "will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the [movant] (satisfying the 'relevance' factor)." *Id.* Where spoliation is due to negligence, the party seeking sanctions establishes the relevance of the destroyed evidence where "a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" *Residential Funding*, 306 F.3d 99 at 108-109 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)) (brackets in original). But, the moving party is not held to "too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence." *Residential Funding*, 306 F.3d at 109. Doing so "would subvert the…purpose of the adverse inference, and would allow parties who have…destroyed evidence to profit from that destruction." *Byrnie v. Town of Cromwell*, 243 F.3d 93, 110 (2d Cir. 2001).

### A. SanDisk's bad faith or gross negligence establishes the evidence was relevant.

The record shows that SanDisk's conduct was in bad faith or, at best, grossly negligent. SanDisk's expertise in the field of data storage makes its actions even more egregious. SanDisk issued a litigation hold which it then did not implement, admittedly failing to preserve Harkabi and Elazar's laptop hard drives. SanDisk evidently also failed to apply procedures through its own information technology group to preserve Harkabi and Elazar's e-mail files on its servers. Further, a Help Desk employee deleted the contents of the hard drives on Harkabi and Elazar's laptops — with the understanding that his doing so was approved by the legal department — and made no backup copy or otherwise ensured that backups would be preserved for this case. This purposeful conduct, all committed by SanDisk employees, amounts to bad faith or, at a minimum, gross negligence, and thereby establishes the relevance of the destroyed materials.

### B. SanDisk's discovery conduct further establishes the relevance of the evidence.

Evidence that a party acted intentionally or grossly negligently in a way that "hinder[s] discovery" can also support an inference that the spoliated documents were relevant. *Residential Funding*, 306 F.3d at 110. This is true even if the intentional or grossly negligent acts "are not ultimately responsible for the unavailability of the evidence…because they did not cause the destruction or unavailability of the missing evidence." *Id.* Such evidence can include a party's acts of "purposeful sluggishness" throughout discovery. *Id.* at 105 ("representation that e-mails would be produced, without mentioning the absence of any from the critical time period…a missed [] deadline…and resistance to responding to technical questions…suggests a somewhat purposeful[] sluggishness.") (brackets in original). Therefore, if SanDisk acted in an intentional

or grossly negligent way that "hindered [] attempts to obtain the [spoliated documents]…it could support an inference that the [spoliated evidence is] harmful to [SanDisk]." *Id.* at 110.

Plaintiffs spent months negotiating a search term protocol with SanDisk even when SanDisk knew or should have known that it did not possess the Harkabi or Elazar e-mail files or the laptop hard drives. SanDisk likely began collecting relevant documents when this dispute first was initiated as a mediation in March 2007. And, SanDisk must have begun collecting documents once plaintiffs sued in September 2008. Reasonably, the first place SanDisk would have looked for relevant documents would be plaintiffs' laptops and their e-mail files on SanDisk's systems. As such, if SanDisk had acted reasonably, it would have known well before discovery began that it did not have the Harkabi and Elazar hard drives and e-mail.

Of course, without these hard drives or e-mail, the search term protocol which SanDisk negotiated with plaintiffs for five months would return only a fraction of plaintiffs' files. Yet throughout these negotiations SanDisk never informed plaintiffs that obvious sources for relevant information — such as Harkabi and Elazar's laptops — were missing. In fact, SanDisk misled plaintiffs. In response to plaintiffs' questions when their search term report showed only a handful of hits for the search terms "Harkabi" or "Elazar" in Harkabi and Elazar's files, SanDisk's in-house counsel stated, in her May 7, 2009 declaration: "I have no reason to believe that the four 'Do-Not-Destroy' Memoranda issued on April 12, 2007, were not fully complied with by SanDisk and its employees, temporary employees, and contractors." (Liedtke ¶9)

Nonetheless, we now know from Scott Dillon's declaration that in February 2009, SanDisk had searched numerous file servers "where plaintiffs' laptop images had likely been stored" and that "multiple smaller-scale reviews of the same servers [had been] conducted" over the next several months — and yet the hard drives had not been found. (Dillon ¶11, 12, 14) Thus,

when Liedtke represented to plaintiffs, under penalty of perjury, that SanDisk had preserved evidence under its litigation hold, other SanDisk personnel knew that the contents of Harkabi and Elazar's laptops had gone missing. As counsel for SanDisk (who had been involved in the matter since October 2008), Liedtke surely should have known about the missing evidence.

Finally, in response to a request for the laptop hard drives, SanDisk further misled plaintiffs. SanDisk stated that "all electronic documents from [the] hard drive[s] that are relevant to this dispute have already been produced." (Stillman, Ex. 11) This sent plaintiffs searching amongst millions of documents when SanDisk knew the files would not be there. The record shows that SanDisk misled plaintiffs about its document production and its now-admitted loss of evidence. That conduct, done either intentionally or with gross negligence, severely hindered discovery and supports the conclusion that the spoliated evidence is relevant.

### C.     Harkabi and Elazar's affidavits establish the evidence was relevant.

A party seeking sanctions need not show "that specific documents were lost," but instead it is "enough to demonstrate that certain types of relevant documents existed and that they were necessarily destroyed." *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 372 (S.D.N.Y. 2006). This can be established by submitting "extrinsic evidence tending to demonstrate that the missing evidence would have been favorable." *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 200 (S.D.N.Y. 2007) (quoting *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048, 2005 WL 1925579, at *8 (S.D.N.Y. August 11, 2005)).

As noted, Harkabi and Elazar made extensive notes on their laptops related to their work. They also sent e-mail to themselves and each other containing notes and discussion about their work. Elazar's laptop notes also memorialized discussions at the meetings that he and Harkabi had with Carlos Gonzalez and the other members of the various U3 teams. Similarly, the missing

laptops contained notes from meetings which addressed the progress of incorporating the MDRM technology into the U3, as well as notes from the important September 2006 meeting with top management at SanDisk where Harkabi and Elazar were told they would be paid the earn-out. Further, the laptops contained the photographs of the technical schematics that Elazar prepared to explain the process to Carlos Gonzalez and others. The laptops also contained Harkabi and Elazar's detailed calendars that tracked their involvement and assistance to the U3 team in incorporating the MDRM technology. The consequences of losing the hard drives is exacerbated by SanDisk's failure to produce its own personnel's notes of key meetings (such as the Gonzalez notebooks), which plaintiffs attest should exist. (Harkabi ¶¶4-9, Elazar ¶¶2-7)

Plaintiffs' affidavits establish that with the loss of the laptop hard drives, whole categories of highly relevant documents no longer exist. And plaintiffs assert that this lost evidence would support their claims. The record conclusively establishes the relevance of the spoliated evidence.

## IV.    SanDisk should be severely sanctioned for its spoliation of key evidence.

In deciding on the severity of a sanction, the Court "should examine the materiality and value of the suppressed evidence upon the ability of a [party] to fully and fairly prepare for trial." *Shaffer v. RWP Group, Inc.*, 169 F.R.D. 19, 26-27 (E.D.N.Y. 1996) (quoting *Gates Rubber Co. v. Bando Chemical Indus., Ltd.,* 167 F.R.D. 90, 104 (D. Colo. 1996)) (brackets in original). Here, plaintiffs expected to support their claims with the information they knew to be contained on the hard drives and e-mail. But because SanDisk destroyed this evidence, plaintiffs must try to piece together the events they know took place — and previously had records of — from an enormous compilation of data that SanDisk has produced. Beyond this clear prejudice to plaintiffs, SanDisk's conduct has delayed progress of the case and created substantial additional costs for plaintiffs. The Court's sanction should remedy these harms.

### A. Summary judgment for plaintiffs is warranted.

Intentional conduct like bad faith or gross negligence is sufficient to support a terminating sanction such as summary judgment. *De Espana,* 2007 WL 1686327, at *3. Where, as here, SanDisk has spoliated all of the files on plaintiffs' laptop hard drives, as well as most of their e-mail, and then misled its adversaries in discovery to conceal the spoliation, terminating sanctions are appropriate. *See Miller v. Time-Warner Commc'ns, Inc.,* No. 97 Civ. 7286, 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999) (imposing sanction of dismissal on plaintiff who erased handwritten notes from discovery and testified falsely about it, even though the spoliation did not prejudice defendants). Here, the destruction of evidence "was of the worst sort: intentional, thoroughgoing, and (unsuccessfully) concealed." *Gutman,* 2008 WL 4682208 at *12. *see also Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068-69 (2d Cir. 1979) (dismissal particularly appropriate when client is responsible for conduct leading to dismissal). We submit that the extreme conduct in this case warrants summary judgment.

### B. At a minimum, the Court should impose an adverse inference.

The adverse inference sanction is available even where the destruction of documents is simply negligent and is imposed "not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." *Turner v. Hudson Transit Lines,* 142 F.R.D. 68, 75 (S.D.N.Y. 1991). If summary judgment is not granted, we request the Court issue an order finding that the evidence from Harkabi and Elazar's e-mail and hard drives would have supported plaintiffs' claims that the U3 used or employed the MDRM technology or a derivative. We request the Court's order also find that the spoliated evidence supports plaintiffs' claim that in September of 2006, representatives of SanDisk acknowledged that Harkabi and Elazar were entitled to the full

earn-out amount and that they instructed that such payment be made. Similarly, the Court's order should preclude SanDisk from offering evidence on whether the U3 uses or employs a derivative of the MDRM technology or regarding what took place during the September 2006 meeting. *See e.g., Cine Forty-Second St. Theatre Corp.,* 602 F.2d at 1064 (holding that a grossly negligent failure to produce discovery justified the preclusion of all evidence related to damages, even though that sanction was "tantamount to a dismissal" of plaintiff's claim).

### C.     In any event, SanDisk should pay for the costs resulting from its spoliation.

The "mildest sanction" that is available to remedy spoliation is an order to "reimburse the opposing party for expenses caused by the failure to cooperate." *Gutman*, 2008 WL 4682208 at *13. As such, in addition to an award of summary judgment, the Court should order SanDisk to pay the cost of this motion, including the investigation of the spoliation. If summary judgment is not granted, SanDisk should also be ordered to pay the cost plaintiffs will incur to conduct additional discovery, including depositions, to establish alternative proof of plaintiffs' claim that the U3 device uses or employs the MDRM technology or a derivative. *See Chan*, 2005 WL 1925579, at *10 ("[C]ompensable costs may arise either from the discovery necessary to identify alternative sources of information or from the investigation and litigation of the document destruction itself.") (internal quotation omitted).

### CONCLUSION

SanDisk has spoliated central evidence to this case, caused significant delay, and greatly increased the costs to plaintiffs to litigate this action. As a sanction for this conduct, plaintiffs respectively request that the Court issue an order granting them summary judgment — or at a minimum, imposing an adverse inference and precluding SanDisk from introducing certain evidence — and further order SanDisk pay the costs resulting from its actions.

Dated: New York, New York
      November 18, 2009

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

By:  /s Charles A. Stillman    
    Charles A. Stillman
    James A. Mitchell
    Daniel V. Shapiro

425 Park Avenue, 26th Floor
New York, NY 10022
(212) 223-0200
cstillman@stillmanfriedman.com
jmitchell@stillmanfriedman.com
dshapiro@stillmanfriedman.com

*Attorneys for Plaintiffs*
*Dan Harkabi & Gidon Elazar*