UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAN HARKABI,<br>GIDON ELAZAR,<br><br>                 Plaintiff,<br><br>     vs.<br><br>SANDISK CORPORATION,<br><br>                 Defendant. | 08 Civ. 8203 (WHP) (THK)<br><br>ECF Case |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANT SANDISK FOR SPOLIATION**

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Tel:  (212) 326-2000

*Attorneys for Defendant SanDisk Corp.*

December 18, 2009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 2

    Plaintiffs' claim regarding SanDisk's U3 device ................................................................. 2

    Retention of Plaintiffs' SanDisk-issued Laptops ............................................................... 5

    Plaintiffs' E-mails ............................................................................................................... 6

    SanDisk's Efforts to Retrieve the Missing Documents and Communications with Plaintiffs' Counsel ............................................................................................................. 8

    SanDisk's Document Production .................................................................................... 10

ARGUMENT ......................................................................................................................... 11

    I.    Plaintiffs cannot meet their burden of showing that SanDisk should be sanctioned for its inability to retrieve the missing records ................................. 11

        A.    Plaintiffs have not shown that SanDisk was culpable ............................ 11

            1.    Plaintiffs have not shown that SanDisk acted in bad faith.......... 12

            2.    Plaintiffs have not shown that SanDisk acted with gross negligence. ................................................................................. 16

        B.    Plaintiffs have not shown that the missing records contained relevant and favorable information. ........................................................ 16

    II.    The requested sanctions are particularly unwarranted. ...................................... 19

        A.    Terminating sanctions are not appropriate where, as here, there is no evidence of bad faith or willfulness .................................................. 19

        B.    Plaintiffs' request for an adverse inference is tantamount to terminating sanctions and should be denied ........................................... 23

        C.    Plaintiffs' request for costs to conduct additional discovery is premature ................................................................................................ 24

    III.    Plaintiffs' Motion is Premature ......................................................................... 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Arista Records LLC, v. Usenet,*
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ................................................. 12, 19, 21, 22

*Benitez v. Straley,*
2008 WL 4093479 (S.D.N.Y. Sept. 2, 2008) .................................................. 12

*Chan v. Triple 8 Palace, Inc.,*
2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ........................................ 20, 21, 24

*Cine Forty-Second Street Theatre Corp.,*
602 F.2d 1062 (2d Cir. 1979) .................................................. 21

*Dahoda v. John Deere, Co.,*
216 Fed. Appx. 124 (2d Cir. Feb. 9, 2007) ....................................... 20, 21

*De Espana v. Am. Bureau of Shipping,*
2007 WL 1686327 (S.D.N.Y. June 6, 2007) ...................................... 12, 16, 21, 25

*DLC Mgmt. Corp. v. Town of Hyde Park,*
163 F.3d 124 (2d Cir. 1998) ....................................................... 12

*Donato v. Fitzgibbons,*
172 F.R.D. 75 (S.D.N.Y. 1997) ..................................................... 22

*Donini Int'l, S.P.A. v. Satec (U.S.A.), LLC,*
2006 WL 695546 (S.D.N.Y. Mar. 16, 2006) ................................................ 25

*Golia v. The Leslie Fay Co., Inc.,*
2003 WL 21878788 (S.D.N.Y. Aug. 7, 2003) ..................................... 20

*Gutman v. Klein,*
2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008) ................................................. 21

*Hamre v. Mizra,*
2005 WL 1083978 (S.D.N.Y. May 9, 2005) ....................................... 15, 19, 20, 21

*In re Adelphia Commc'ns Corp.,*
317 B.R. 612 (Bankr. S.D.N.Y. 2004) ...................................... 14

*In re Terrorist Bombings of U.S. Embassies in East Africa,*
552 F.3d 93 (2d Cir. 2008) ....................................................... 15

*Indem. Ins. Co. of North Am. v. Liebert Corp.,*
1998 WL 363834 (S.D.N.Y. June 26, 1987) ...................................... 19, 22

*John Street Leasehold, LLC v. Capital Mgmt. Res., L.P.,*
154 F. Supp. 2d 527 (S.D.N.Y. 2001) ................................................. 13

*Kingsway Fin. Servs., Inc. v. PricewaterhouseCoopers LLP,*
2008 WL 5423316 (S.D.N.Y. Dec. 31, 2008) ...................................... 14

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Excelsior Trading Corp.,*
2008 WL 1771917 (E.D.N.Y. Apr. 15, 2008) ...................................... 15, 21

**TABLE OF AUTHORITIES**
(continued)

Page

*Mathias v. Jacobs*,
167 F. Supp. 2d 606 (S.D.N.Y. 2001) ................................................... 12

*Miller v. Time-Warner Commc'ns, Inc.*,
1999 WL 739528 (S.D.N.Y. Sept. 22, 1999)......................................... 21

*Port Auth. Police Asian Jade Soc'y of New York & New Jersey*
*Inc. v. Port Auth. of New York and New Jersey*,
601 F. Supp. 2d 566 (S.D.N.Y. 2009) ............................................ 23, 24

*Rahman v. Smith & Wollensky Rest. Group Inc.*,
2009 WL 773344 (S.D.N.Y. Mar. 18, 2009) ......................................... 13

*Remee Products Corp. v. Sho-Me Power Elec. Coop.*,
2002 WL 31323827 (S.D.N.Y. Oct. 17, 2002)....................................... 13

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002) ..................................................... 11, 12, 17

*Scalera v. Electrograph Sys., Inc.*,
2009 WL 3126637 (E.D.N.Y. Sept. 29, 2009) .................................. 16, 23

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
490 F.3d 130 (2d Cir. 2007) ............................................................ 20, 21

*Schwarz v. FedEx Kinko's Office*,
2009 WL 3459217 (S.D.N.Y. Oct. 27, 2009)............................ 11, 17, 20

*Steele v. Costco Wholesale Corp.*,
2005 WL 1068137 (E.D.N.Y. May 6, 2005) ......................................... 25

*Toussie v. County of Suffolk*,
2007 WL 4565160 (E.D.N.Y. Dec. 21, 2007)..................... 16, 17, 18, 23

*Treppel v. Biovail Corp.*,
249 F.R.D. 111 (S.D.N.Y. 2008) ..................................... 14, 17, 23

*United States. v. Int'l Bhd. of Teamsters*,
948 F.2d 1338 (2d Cir. 1991) ............................................................ 12

*Valentine v. Mercedes-Benz Credit Corp.*,
1999 WL 787657 (S.D.N.Y. Sept. 30, 1999)...................................... 20, 22

*Warren Publ'g Co. v. Harris Publ'ns, Inc.*,
1999 WL 558140 (S.D.N.Y. Jul. 30, 1999)........................................... 21

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999) ............................................................ 20

*White v. Fuji Photo Film USA, Inc.*,
2009 WL 1528546 (S.D.N.Y. June 1, 2009) ................................... 19, 23

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage*,
564 F.3d 110 (2d Cir. 2009) ............................................................ 12

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ................................................. 14, 16, 17

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Statutes**

Fed. R. Civ. P. 37(b)(2)............................................................................. 11

Fed. R. Civ. P. 37(e) ................................................................................. 13

## PRELIMINARY STATEMENT

Plaintiffs' spoliation motion should be denied.  In response to plaintiffs' document requests and in good faith compliance with its discovery obligations, SanDisk[1] has searched nearly a billion pages of electronically stored documents, and produced over seven million of those pages to plaintiffs.  The only items SanDisk has been unable at this point to locate or retrieve are the images it made of plaintiffs' laptops and certain of their e-mails.  As to these records, SanDisk took all appropriate preservation measures, and its inability to locate and produce them is the product of limitations on SanDisk's archival systems that predated receipt of plaintiffs' preservation demand and inadvertent losses that SanDisk is unable to explain.  Under these circumstances, sanctions are not warranted.  Where, as here, sanctions are sought pursuant to the Court's inherent power, there must be proof of bad faith.  While SanDisk regrets its inability to retrieve the missing records, plaintiffs have failed to advance any evidence that this failing is the product of bad faith or even gross negligence.

Plaintiffs are also required, yet have failed, to adduce extrinsic evidence showing that the missing information is likely to be relevant; nor could they.  Plaintiffs' claim is based on their assertion that SanDisk's U3 device "uses or embeds" MDRM technology, or a derivative thereof. The determination of that claim rests entirely on a comparison of the technology contained on

---

[1] For convenience, we cite to SanDisk Corporation as "SanDisk," MDRM, Inc. as "MDRM," and plaintiffs Daniel Harkabi and Gidi Elazar collectively as "plaintiffs."  We cite to Plaintiffs' Memorandum of Law for Sanctions as "Pl. Mem." and the complaint as "Compl."  We also submit the December 18, 2009 declaration of Carlos Gonzales ("Gonzalez Decl."), the December 17, 2009 declaration of Scott Dillon ("Dillon December Decl."), the December 16, 2009 declaration of Yoram Cedar ("Cedar Decl."), the December 17, 2009 declaration of Eli Harari ("Harari Decl."), the December 17, 2009 declaration of Tom Baker ("Baker Decl."), the December 18, 2009 Declaration of James G. Barrick, Jr. ("Barrick Decl."), and the December 18, 2009 declaration of Charles E. Bachman ("Bachman Decl.").  Unless otherwise noted, this memorandum omits internal quotation marks in citations and adds any emphasis reflected in quoted passages.

the U3 with the MDRM technology, which is documented in computer code that has been produced to plaintiffs.  The affidavits plaintiffs submitted in an effort to establish the relevancy of the missing information dwell exclusively on what was discussed before and after the U3 device was produced and are entirely silent as to what technology is present on the U3.  Yet it is only the latter that will determine plaintiffs' claims.  Tellingly, plaintiffs have not included in their motion papers a single one of the seven million pages of documents already produced to them that would identify the MDRM technology they claim is used or embedded on the U3.

The remedies plaintiffs seek through this motion are particularly unwarranted.  Plaintiffs' draconian demand for a default judgment is unsupported by well-established Second Circuit case law.  Plaintiffs' alternative request for an adverse inference is tantamount to a request for terminating sanctions and fails for the same reasons as the demand for a default judgment.  Plaintiffs' other alternative request for future costs that plaintiffs will allegedly have to incur to take additional discovery and depositions should also not be awarded as it is premature.

Finally, as SanDisk has advised plaintiffs, it recently has begun searching backup tapes not previously searched that it believes should yield the missing e-mails together with their attachments.  Accordingly, at best plaintiffs' motion is premature.

## STATEMENT OF FACTS

### Plaintiffs' claim regarding SanDisk's U3 device

MDRM was a small privately-held Israeli company founded by plaintiffs.  (Compl. ¶ 6.) MDRM had previously created a product called BookLocker, which allowed users to securely download textbooks onto a flash memory drive.  (Harkabi Decl. ¶ 2.)  In December 2004, SanDisk purchased MDRM for $14 million, $4 million of which was placed in escrow and payable to plaintiffs subject to an earn-out provision.  (Compl. ¶ 11.)  The earn-out provided

payment based on the number of SanDisk units "using or embedding" MDRM's technology, or derivatives thereof, that were "sold" during the two-year period after the closing date of the purchase agreement. (*See* Compl. Ex. 1 § 1.4.)

Plaintiffs claim that "[a]t the heart of both the Booklocker and U3 technologies is the requirement to *produce* flash drives with unique identification numbers." (Pl. Mem. at 4; Elazar Decl. ¶ 4; Harkabi Decl. ¶ 6.) Plaintiffs argue that they are entitled to compensation for the sale of SanDisk's U3 device, because "the U3 team decided to use the *manufacturing system* developed using MDRM technology" and that "each step of the U3 *manufacturing process* uses MDRM technology or derivatives thereof." (Compl. ¶ 22.) Plaintiffs further claim that they taught SanDisk how to "implement the MDRM approach to *manufacturing* devices with unique identification numbers using "golden keys." (Pl. Mem. at 4; Elazar Decl. ¶ 4; Harkabi Decl. ¶ 6.)

Thus, plaintiffs' allegations argue, at most, that MDRM technology was used *to help manufacture* U3 devices but not that it is used or embedded *in* the devices. That distinction is critical and fatal to plaintiffs' claims. SanDisk does not dispute that plaintiffs were asked to assist in developing a portion of the manufacturing process for the U3. (Gonzalez Decl. ¶¶ 13, 17.) But employing software developed by plaintiffs as a part of the manufacturing process of the U3 does not satisfy the conditions of the earn-out provision because none of that technology was "used or embedded" on the U3 device. (*Id.* ¶¶ 12, 14, 17.)

To this day, plaintiffs have still not identified what MDRM technology they contend resides in the U3 device. But according to their complaint, the only part of the U3 device that plaintiffs were involved with in any way was the Device ID (the "DID"). (Compl. ¶¶ 22–23.) And even that involvement was limited to the manufacturing process for the DID. (Gonzalez Decl. ¶ 18.) But of even greater significance, and dispositive of plaintiffs' claims, is the

indisputable fact that the U3 DID is composed of *entirely non-proprietary, publicly available, industry-standard* data structures, and as such cannot by definition "use or embed" MDRM technology or a derivative thereof.  (*Id.* ¶ 8.)

A Device ID is not a unique concept to either the U3 device or even to SanDisk products.  In fact, virtually all computer peripherals, such as external hard drives, printers, and monitors contain a Device ID. (*Id.* ¶¶ 8, 9.)  The DID for the U3 device has three components:  (1) the ID or serial number; (2) the "RSA 512 key"; and (3) the "X509 certificate."  (*Id.* ¶ 8.)

The ID or serial number is just that, a randomly assigned number that identifies a device, much like a VIN number identifies an automobile.  (*Id.* ¶ 9.)  Every one of the dozens of storage devices manufactured by SanDisk, including those manufactured long before SanDisk was even introduced to plaintiffs, contains an ID serial number.  (*Id*.)  Indeed, virtually every computer peripheral manufactured by any company contains an ID serial number.  (*Id.* ¶ 9.)

The "RSA 512 key" and "X509 certificate" are data structures that are utilized for authentication and/or encryption operations.  Both the RSA 512 key and the X509 certificate are non-proprietary, publicly available, industry-standard data structures.  The RSA 512 key and the X509 certificate were included in the U3 DID in anticipation of authentication and e-commerce functions for the SanDisk U3 device.  Ultimately the SanDisk U3 device was never marketed or used for these functions, and as such, the RSA 512 key and X509 certificate are never utilized and remain only as artifacts.  (*Id.* ¶ 10.)[2]  Plaintiffs had no involvement or role in developing the parameters for the identification number or the selection of the RSA 512 key or the X509

---

[2] Plaintiffs' emphasis on "golden keys" is also misplaced.  The golden keys were used only in the manufacturing process and were not used or embedded in the U3 device.  Moreover, their use in the manufacturing process was terminated after only a few months.  (Gonzalez Decl. ¶ 15.)

certificate embedded in the U3.  Those decisions were made by the U3 development team with no input from plaintiffs. (*Id.* ¶ 11.)[3]

SanDisk believes these facts will ultimately dictate summary judgment in its favor. However, for purposes of the present motion, it is sufficient that these facts demonstrate that plaintiffs' claims will be determined solely by the content of the U3 computer code that (1) is fully documented; (2) has been produced to plaintiffs; and (3) is entirely unaffected by SanDisk's inability to retrieve the images of plaintiffs' laptops and certain of their e-mails.

### Retention of Plaintiffs' SanDisk-issued Laptops[4]

On or around March 1, 2007, plaintiffs left SanDisk.[5]  On or about March 7, 2007, Megan Comport, SanDisk's then-Assistant General Counsel, received a letter from plaintiffs' counsel at the time, requesting that SanDisk retain relevant documents, including plaintiffs' laptops.  The next day, Comport contacted Scott Dillon, then-Director of IT Global Operations,

---

[3] While there is common storage code present on both the U3 and BookLocker devices, that code is generic code present on numerous SanDisk storage products.  Moreover, this code was not developed by plaintiffs, nor does it contain any MDRM technology or its derivatives.  Similarly portions of the source code used to compile the object code present on the U3 and BookLocker is common, but it does not contain MDRM technology or derivatives thereof, and was never transferred to nor present on the U3 device.  (Gonzalez Decl. ¶ 16.)

[4] SanDisk has learned that Harkabi used his personal Apple laptop almost exclusively while employed at SanDisk.  (*See* Gonzalez Decl. ¶ 20; Cedar Decl. ¶¶ 5–6.)  On November 2, 2009, SanDisk served plaintiffs with a request to inspect this laptop.  (Bachman Decl. Ex. N.)  On December 2, 2009, plaintiffs rejected this request, claiming that Harkabi had deleted all SanDisk information on this laptop when he left the company in accordance with SanDisk policy.  (*Id.* Ex. O.)  SanDisk believes that it is entitled to inspect this device to confirm that representation and to determine when that data was deleted and whether it can be restored, and thus will be separately moving to compel.

[5] Throughout their papers, plaintiffs portray their departure from SanDisk as a retaliatory firing.  (Pl. Mem. at 1, 5-6; Harkabi Decl. ¶ 9; Elazar Decl. ¶ 7.)  These allegations are not only irrelevant to plaintiffs' motion but are untrue and appear intended to paint SanDisk as oppressive and unfair.  In fact, plaintiffs departed pursuant to a reduction-in-force, *which they expressly requested to be a part of*.  And in connection therewith they received generous separation benefits.  This of course, is in addition to the $4 million dollars each plaintiff received through the acquisition of MDRM.  (*See* Baker Decl. ¶¶ 5, 7.)

requesting that Harkabi's and Elazar's laptops remain secured and untouched.  (Bachman Decl. Ex. J, ¶ 8.)  Comport also issued an appropriate document-preservation notice to all affected employees.  (*Id.* Ex. J at Ex. 3.)

Pursuant to SanDisk's normal retention procedures, Dillon contacted the IT Help Desk and confirmed that SanDisk possessed Harkabi's and Elazar's laptops and that the laptops had not been modified since their termination.  (*Id.* Ex. J at Ex. A.)  During this time, Dillon also received an e-mail from Tom Baker, SanDisk's then-Vice President of Human Resources, listing the terminated employees (including plaintiffs) whose computers were to remain secured and untouched.  (*Id.* Ex. J, ¶ 9.)  On March 9, 2007, Dillon forwarded the list to Gurpreet Sahni, a Help Desk employee whom Dillon supervises, and instructed him to ensure that plaintiffs' laptops would remain secured and untouched.  (*Id.* Ex. J, at Ex. B.)  On April 16, 2007, Sahni confirmed that plaintiffs' computers were still secured.  (*Id.* Ex. J, ¶ 10 & Ex. C.)

Plaintiffs' laptops remained untouched in a secure storage area at SanDisk headquarters for over a year until in or about April 2008.  (*Id.* Ex. K, ¶ 8.)  In or about April 2008, Sahni contacted Michael Podobnik, then-Senior Manager of Information Security, requesting to image, clean, and reissue plaintiffs' laptops.  (*Id.* Ex. K, ¶ 10.)  Podobnik forwarded Sahni's request to SanDisk's Legal department and received their approval to do so, which he forwarded to Sahni. (*Id.*)  A week later, Sahni and two technicians imaged plaintiffs' laptops and saved the images on a SanDisk file server located at SanDisk headquarters.  (*Id.* Ex. K, ¶ 11.)  Unfortunately, SanDisk has been unable to retrieve these images.  All of the foregoing facts regarding SanDisk's efforts to preserve plaintiffs' laptops are undisputed.

**Plaintiffs' E-mails**

During the time that plaintiffs were at SanDisk, e-mails were sent and received through an Exchange Server, which maintained an "Inbox" for each SanDisk employee.  (Dillon

December Decl. ¶ 5.)  An employee's Inbox provided storage for only a limited number of e-mails.  When an Inbox became full, unless an employee took steps to preserve them, his or her historical e-mails would be overwritten and not preserved on the Exchange Server.  (*Id*.)  This was an ordinary course of business process that long predated this dispute.  (*Id.* ¶ 6.)  SanDisk does not know what plaintiffs did when their Inbox's became full, and accordingly, which of plaintiffs' e-mails may have been deleted through their own failure to preserve.  When plaintiffs departed SanDisk, their e-mail accounts were disabled so they could not log into the account, but the contents thereof were preserved.  (*Id*. ¶ 8.)

In early 2008, subsequent to plaintiffs' departure but before this litigation commenced, SanDisk upgraded parts of its IT system.  As a part of this upgrade, SanDisk installed a system called "Evault" in order to provide improved and centralized e-mail archival services to employees.  (*Id.* ¶ 9.)  It now appears that in the course of installing Evault, plaintiffs' e-mail accounts were not picked up because they were no longer employees.  However, SanDisk believes that the backup tapes it recently began searching should contain the contents of those accounts and any e-mails that are recovered will be produced immediately. [6]  (*See* Barrick Decl. ¶ 6.)   Plaintiffs' counsel has been informed of this search.  As it is, any e-mails plaintiffs sent to any custodian they designated who was a SanDisk employee on the date Evault was installed, were preserved and have already been produced to plaintiffs.  These number in excess of 12,000 e-mails.  Other e-mails produced to plaintiffs from the custodians they designated number in excess of 538,000.

---

[6] These tapes had not previously been searched because SanDisk believed its searches of the Evault system had picked up plaintiffs' e-mail accounts and to search these tapes would require processing billions of pages of documents at a significant cost.  (Barrick Decl. ¶ 6.)

**SanDisk's Efforts to Retrieve the Missing Documents and Communications with Plaintiffs' Counsel**

SanDisk has devoted substantial resources searching for the missing records, including over 200 man-hours of employee and consultant time. In connection with its overall document production effort, in or around February 2009, SanDisk conducted a five-day manual search of its twelve file servers (and each folder located thereon). (Bachman Decl. Ex. J, ¶ 11.) SanDisk subsequently performed multiple smaller-scale reviews of the same servers over a period of several months, effectively replicating the initial full-scale search of all twelve servers. (*Id.* Ex. J, ¶ 12.) Once SanDisk learned that the laptop images had not been picked up in SanDisk's seven-million page production, SanDisk conducted another extensive search of relevant servers and backup tapes in August 2009. (*Id.* Ex. J, ¶ 13.) And now, SanDisk is conducting another review of the backup tapes, a review that will require hundreds of hours of computer and employee time.[7]

None of the complaints plaintiffs raise regarding these efforts and SanDisk's communications with counsel have merit. Plaintiffs' assertion that SanDisk misled them and their counsel for months and were "purposefully sluggish" by hiding the fact that SanDisk could not locate the laptop images is entirely groundless. (*See* Pl. Mem. 8-10, 20, 22.) The electronic document search SanDisk conducted in February 2009 was for *all* documents potentially responsive to plaintiffs' document requests. It was a review based on plaintiffs' designated search-terms without any specific reference to plaintiffs' laptop images. Due to the massive number of documents returned from this search, SanDisk did not conduct a review thereof but instead engaged in negotiations with plaintiffs in an attempt to better refine the proposed search term list. Those negotiations culminated in a June 8, 2009 conference with the Court, subsequent

---

[7] There is at a minimum 1,200 terabytes of data contained on these tapes, which is the equivalent of 18 billion pages of documents. (Barrick Decl. ¶ 7.)

to which plaintiffs agreed to accept all documents that their search-terms and custodians generated, with the knowledge and agreement that SanDisk would not review them before production.  (*See* Bachman Decl. Exs. E & F.)  On June 18, 2009, a hard drive containing the unreviewed data was delivered to plaintiffs' counsel (the "Production").  (Bachman Decl. Ex. G.)  At this point, SanDisk was unaware that the contents of the laptop images were not included in the Production.  Therefore, SanDisk was fully honest when it informed plaintiff on June 22, 2009 that, as it believed at the time, "all electronic documents from [plaintiffs'] hard drive that are relevant to this dispute have already been produced."  (Stillman Decl. Ex. 11.)[8]

It was not until late July 2009, after the parties had the opportunity to review the Production that it became apparent the laptop images had not been picked up.  In response, SanDisk immediately commenced another extensive review of its electronic archives for the laptop images.  This search included reviewing a 700 gigabyte catalog of backup tapes, which had been sent to storage vendor for preservation, as well as an index of all available laptop images.  (Bachman Decl. Ex. J, ¶ 13.)

Thus, plaintiffs' assertions that for months SanDisk affirmatively hid the fact that the laptop images were missing and that it was not until September 10, 2009 that SanDisk's counsel "finally admitted" that it was unable to locate the laptop images are simply untrue.  (*See* Pl. Mem. at 10; Stillman Decl. ¶ 3.)  It was not until late July 2009 that SanDisk discovered that the images had not been produced, and well before September 10, SanDisk's counsel telephoned plaintiffs' counsel on multiple occasions to provide regular updates on the status of the search for

---

[8] Plaintiffs also find fault with SanDisk's counsel's April 14, 2009 e-mail correspondence with plaintiffs' counsel for failing to disclose that the laptops had been imaged and then re-used.  (Pl. Mem. at 8.)  The reason this was not disclosed is that there was nothing improper with imaging the laptops (*see infra* p. 14 n.11), and the fact that the images themselves were missing was not known at that time.

the images.  (Bachman Decl. ¶ 10 & Ex. H.)  Indeed, the first sentence of SanDisk's counsel's September 10 letter explicitly stated that the letter was a "follow up on [ ] recent telephonic updates to [Mr. Stillman] regarding SanDisk's efforts to locate the image copies of the plaintiffs' hard drives."  (*Id*. Ex. H.)  Mr. Stillman responded by e-mail to that letter that same day, thanking counsel for the update and asking about the content of the declarations that SanDisk would be submitting regarding the laptop images.  (*Id.* Ex. I.)  Prior to submitting his affirmation in support of plaintiffs' motion, Mr. Stillman had never indicated that SanDisk's counsel has been anything but completely forthcoming about document-production issues.  In fact, he has repeatedly stated to the contrary, including during conferences before the Court.  (*Id.* ¶ 11.)

Finally, plaintiffs take issue with Julie Liedtke's May 7, 2009 declaration, and specifically her statement therein that she had "no reason to believe that the four 'Do-Not-Destroy' Memoranda issued on April 12, 2007, were not fully complied with by SanDisk and its employees, temporary employees, and contractors."  (Pl. Mem. at 8–9; Bachman Decl. Ex. D, ¶ 9.)  Plaintiffs, however, offer no support beyond their own speculation that her statement must be misleading because no mention was made of the missing laptop images.  However, Ms. Liedtke's declaration was submitted more than three months before the electronic search was completed and four months before it became known that the laptop images were missing.

Accordingly, throughout the discovery process, SanDisk has acted in good faith in its relations with plaintiffs and its representations to them have been honest and accurate based upon the information SanDisk knew at the time.

### SanDisk's Document Production

SanDisk has produced to plaintiffs over 520 gigabytes (approximately 7 million pages of documents) generated entirely by plaintiffs' chosen custodians and search terms.  (*See* Stillman

Decl. ¶ 7; Bachman Decl. Ex. G.)  Included in this production were the relevant code for the U3 including the Device ID code.[9]

## ARGUMENT

**I.    Plaintiffs cannot meet their burden of showing that SanDisk should be sanctioned for its inability to retrieve the missing records.**

In order to prevail on their motion, plaintiffs must establish that (1) SanDisk had an obligation to preserve the missing records at the time they were lost; (2) SanDisk lost or destroyed the records "with a culpable state of mind"; and (3) the destroyed evidence was "relevant" to plaintiffs' claim "such that a reasonable trier of fact could find that it would support that claim."  *Schwarz v. FedEx Kinko's Office*, 2009 WL 3459217, at *6 (S.D.N.Y. Oct. 27, 2009) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107–08, (2d Cir. 2002)).

Plaintiffs' motion should be dismissed and no sanctions imposed because plaintiffs have not and cannot meet their burden of establishing (i) SanDisk's culpability, or (ii) that the missing records contained information relevant and favorable to their claims.

### A.    Plaintiffs have not shown that SanDisk was culpable.

Federal Rule of Civil Procedure 37(b)(2) provides that the Court may sanction a party for disobeying a discovery order.  Fed. R. Civ. P. 37(b)(2).  Where there has been no violation of a discovery order, the Court may also impose sanctions on a party for discovery misconduct under "its inherent power to manage its own affairs."  *Residential Funding Corp.*, 306 F.3d at 106–07.  But in the latter case, the Second Circuit, "in recognizing the need for restraint, has always

---

[9] Plaintiffs' complaint that SanDisk has failed to produce Carlos Gonzalez' black-and-white composition notebooks is groundless.  (Pl. Mem. at 5, 23; Harkabi Decl. ¶ 7; Elazar Decl. ¶ 5.)  Mr. Gonzalez did not use a notebook that would fit that description during meetings with plaintiffs.  (Gonzalez Decl. ¶ 19.)  He did occasionally use a green notepad, the relevant pages of which have been produced.  (*Id.*)

required a particularized showing of bad faith to justify the use of the court's inherent power."
*United States. v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991); *accord Wolters
Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 113–14 (2d Cir. 2009); *Mathias v. Jacobs*,
167 F. Supp. 2d 606, 623 (S.D.N.Y. 2001).  This requirement extends to spoliation motions,
particularly where terminating sanctions are sought.  *See Arista Records LLC, v. Usenet*, 633 F.
Supp. 2d 124, 138 (S.D.N.Y. 2009) (denying terminating sanctions even where defendants'
spoliation was intentional and in bad faith); *see also Benitez v. Straley*, 2008 WL 4093479, at *5
(S.D.N.Y. Sept. 2, 2008) ("A finding of bad faith, however, is required to impose sanctions
based on the Court's inherent powers."); *De Espana v. Am. Bureau of Shipping*, 2007 WL
1686327, at *2 (S.D.N.Y. June 6, 2007) (denying sanctions under court's inherent power where
no proof of bad faith or willfulness). [10]  Because SanDisk has not violated any discovery order in
this case, plaintiffs have the burden to show that SanDisk's inability to retrieve the missing
records is the result of bad faith.

    1.   Plaintiffs have not shown that SanDisk acted in bad faith.

      In order to establish bad faith in the discovery-abuse context, plaintiffs must show
"(1) clear evidence or (2) harassment or delay or . . . other improper purposes."  *DLC Mgmt.
Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998).  As demonstrated above,
SanDisk has consistently acted in good faith.  SanDisk segregated and secured plaintiffs' laptops
immediately upon receipt of their preservation demand, subsequently imaged the laptops

---

[10] Plaintiffs' citation to *Residential Funding Corp.*, 306 F.3d 99 (2d Cir. 2002), for the
proposition that mere negligence can establish culpability is incorrect. In that case, the court
found that the conduct was "more akin to those in which a party breaches a discovery obligation
or fails to comply with a court order regarding discovery," (*see id.* at 106), and treated the
conduct as a Rule 37 violation.  In any event, cases subsequent to *Residential Funding* have
reaffirmed that imposing inherent-power sanctions require a finding of bad faith.  *See Wolters
Kluwer Fin. Servs., Inc.*, 564 F.3d at 113-14.

contents, and expended substantial efforts to retrieve those images.  All e-mails contained on the

Evault system that were responsive to plaintiffs' search terms have been preserved and produced

to plaintiffs.  Any e-mails that were not preserved because of the archival limitations of the

Exchange Server and plaintiffs' own archival practices that predated this dispute (*supra*, pp. 6–7)

are not actionable as no spoliation occurs where documents are not preserved because they are

deleted or otherwise destroyed in the normal course of business.  *See Remee Products Corp. v.*

*Sho-Me Power Elec. Coop.*, 2002 WL 31323827, at *8 (S.D.N.Y. Oct. 17, 2002) (finding no

culpability for destroying documents where company had ongoing policy of destroying these

documents and was unaware of impending litigation at time of destruction); *John Street*

*Leasehold, LLC v. Capital Mgmt. Res., L.P.*, 154 F. Supp. 2d 527, 541 (S.D.N.Y. 2001) (no

culpability where defendants discarded documents in normal course of business).  Indeed,

Federal Rule of Civil Procedure 37(e) provides that "[a]bsent exceptional circumstances, a court

may not impose sanctions . . . for failing to provide electronically stored information lost as a

result of the routine, good-faith operation of an electronic information system."  Fed. R. Civ. P.

37(e).  Finally, any e-mails lost in connection with the installation of the Evault system was the

product of inadvertent conduct, unrelated in any way to this litigation.  In fact, this litigation had

not even commenced at the time of the installation.  And in any event, SanDisk believes those e-

mails should be recovered in the course of its current review of backup tapes.

   Plaintiffs' conclusory claims to the contrary are unfounded.  While plaintiffs complain of

the fact that the Do-Not-Destroy memos were not issued until a month after receiving the

preservation request from plaintiffs' counsel, they offer no evidence that any spoliation occurred

during that one month.  (*See* Pl. Mem. at 17.)  Absent such evidence, no sanctions are warranted.

*See Rahman v. Smith & Wollensky Rest. Group Inc.*, 2009 WL 773344, at *6 (S.D.N.Y. Mar. 18,

2009) (rejecting plaintiff's claim that spoliation of evidence occurred merely because defendant did not issue litigation hold until two years after lawsuit commenced).  Here, in the month between receiving plaintiffs' March 7, 2007 preservation demand and distributing the Do-Not-Destroy memos, the plaintiffs' laptops were segregated and no e-mails were deleted.

Plaintiffs' further attack SanDisk's legal department's decision to allow Gurpreet Sahni to convert plaintiffs' laptop hard drives into mirror images.  (Pl. Mem. at 18.)  But plaintiffs offer no support for its contention that SanDisk was required to preserve the laptops themselves, rather than making identical images of them.  Nor can they, as courts recognize "that there are many ways to manage electronic data, [and] litigants are free to choose how this task is accomplished," *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).  Indeed, preservation of laptops through images is standard procedure.[11]  Plaintiffs also offer no facts to support their intimation that "SanDisk's inability to locate the contents of the laptop hard drives . . . strongly suggests that this evidence was never backed up at all," (Pl. Mem. at 18), and SanDisk employees have sworn to the contrary (Bachman Decl. Ex. J & K).  Plaintiffs' claim that in-house counsel failed to supervise Sahni properly or take the laptop hard drives into their own possession is similarly without foundation as there was never a reason to think that the laptop images were not properly preserved.

SanDisk's immediate physical segregation and secure storage of plaintiffs' laptops and their subsequent imaging, together with the issuance of litigation hold memos and the use of

---

[11] *See, e.g.*, *Zubulake*, 220 F.R.D. at 218 (mirror image of computer system allows for "preserv[ation] [of] documents in the state they existed at [the] time" and allows for creation of "complete set" of documents); *Kingsway Fin. Servs., Inc. v. PricewaterhouseCoopers LLP,* 2008 WL 5423316, at *9 (S.D.N.Y. Dec. 31, 2008) (PwC imaged employees' laptop hard-drives); *Treppel v. Biovail Corp.,* 249 F.R.D. 111, 117 (S.D.N.Y. 2008) (defendants made hard-drive images of employees' laptops); *In re Adelphia Commc'ns Corp.,* 317 B.R. 612, 619 (Bankr. S.D.N.Y. 2004) (same).

backup tapes for e-mails demonstrates that its intent at all times was to preserve the missing records.  Although SanDisk now has been unable to retrieve these records, plaintiffs have not shown that this is due to any bad faith or willfulness.

SanDisk has also not misled nor been "purposefully sluggish" with plaintiffs.  As demonstrated above, as soon as SanDisk received plaintiffs' request for documents on December 31, 2008, it immediately commenced an electronic search while engaging in search-term negotiations with plaintiffs.  SanDisk reasonably relied on the wide-reaching electronic search to capture the missing records, and it was only after that search was finalized and the documents produced, that either side saw what was contained in the Production (which, as plaintiffs agreed, SanDisk did not review).  Once it became apparent that the laptop images were not in the Production, SanDisk immediately commenced another review.  And now that plaintiffs have identified missing e-mails, SanDisk is engaged in a time-consuming and expensive review of backup tapes to locate additional e-mails.  Throughout this process, SanDisk's counsel has always promptly and honestly apprised plaintiffs' counsel on the facts regarding these searches.

Accordingly, because there is no evidence that SanDisk acted in bad faith with intent to destroy the missing records, there is no ground for plaintiffs' sanction motion.  *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (holding government's destruction of tapes containing intercepted telephone conversations could not amount to spoliation where there was no evidence that tapes were intentionally destroyed); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Excelsior Trading Corp.*, 2008 WL 1771917, at *3 (E.D.N.Y. Apr. 15, 2008) (holding no spoliation where plaintiff did not produce proof "sufficient to establish [defendant's] intent to have the evidence destroyed"); *Hamre v. Mizra*, 2005 WL

1083978, at *3 (S.D.N.Y. May 9, 2005) (adopting order denying motion to sanction defendants where there was no showing of bad faith or willfulness).

>    2.   Plaintiffs have not shown that SanDisk acted with gross negligence.

Even if the Court were to adopt a lower level of culpability than bad faith, plaintiffs have still failed to show that SanDisk acted with gross negligence.  Judge Tomlinson's recent decision in *Scalera v. Electrograph Sys., Inc.*, 2009 WL 3126637 (E.D.N.Y. Sept. 29, 2009), is instructive on this point.  In *Scalera*, the defendant failed to preserve electronic evidence two months after the plaintiff's EEOC charge had been filed, and even then, only "key players" were informally notified.  *Id.* at **15–16.  At that point, a defendant employee's computer had been erased and re-issued so that all of her data had been lost.  *Id.*  The court found that while the company breached its duty to preserve evidence, its acts and omissions were merely negligent and not grossly negligent and as such no sanctions were warranted.  *Id.* at *16.  SanDisk's conduct here was far less culpable as it *immediately* segregated plaintiffs' laptops after receiving plaintiffs' preservation demand, subsequently issued comprehensive Do-Not-Destroy memos, created mirror images of the laptops and preserved e-mails to backup tapes.  (Bachman Decl. Exs. J & K; Dillon December Decl. ¶ 8.)  In light of *Scalera,* SanDisk's conduct could not support a finding of gross negligence.  *See also De Espana*, 2007 WL 1686327, at *8 (denying sanctions where failure to preserve electronic documents did not constitute bad faith or gross negligence).

>   **B.   Plaintiffs have not shown that the missing records contained relevant and favorable information.**

In addition to culpability, plaintiffs must show that the information contained in the missing records is relevant and favorable to their claims.  *See Toussie v. County of Suffolk*, 2007 WL 4565160, at *8 (E.D.N.Y. Dec. 21, 2007); *Zubulake*, 220 F.R.D. at 221 (holding that relevance prong requires proof that missing e-mails would support plaintiff's claims).  Because

there is no evidence of bad faith on the part of SanDisk, "relevance must be proven by the party seeking the sanctions." *Zubulake*, 220 F.R.D. at 221 (finding defendants' negligence or even recklessness not enough to draw inference about destroyed evidence).  *See Treppel*, 249 F.R.D. at 121–22 (requiring plaintiff to establish relevance of lost evidence where defendant's destruction of evidence was not willful, and even if grossly negligent, not egregious); *Toussie*, 2007 WL 4565160, at *8 (finding of gross negligence and "foot dragging" not sufficient to show relevance as matter of law where defendants' conduct not egregious).

    In the context of alleged spoliation claims, relevance means:

> something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence.  Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.

*Schwarz v. FedEx Kinko's Offic*e, 2009 WL 3459217, at *8 (S.D.N.Y. Oct. 27, 2009) (citing *Residential Funding*, 306 F.3d at 108–09).  "In other words, the plaintiffs here must present *extrinsic evidence* tending to show that the destroyed [documents] would have been favorable to their case." *Toussie*, 2007 WL 4565160, at *8 (finding extrinsic evidence did not show that destroyed evidence would have been favorable).  Here, plaintiffs have not met this standard.

    In support of the alleged relevance of information contained in the missing records, plaintiffs offer only self-serving affidavits that state in conclusory terms, without any detail or support, that the U3 devices use MDRM technology (Harkabi Decl. ¶ 6; Elazar Decl. ¶ 4), and that their laptops and e-mail accounts contained "detailed e-mail conversations and calendars that tracked [their] involvement and assistance to the U3 team in incorporating the MDRM

technology" and notes and e-mail correspondence regarding meetings with SanDisk executives regarding the earn-out provision (Harkabi Decl. ¶¶ 7, 8; Elazar Decl. ¶¶ 5, 6).[12]

But as demonstrated above, no account of any meeting or conversation can or does prove or disprove whether MDRM technology or its derivatives are "used" or "embedded" in the U3 product in a manner that satisfies the requirements of the parties' contract.  Both plaintiffs' technology and the technology present in the U3 device are reduced in their entirety to writing in computer code and related documents, which has all been produced to plaintiffs.  A comparison of those documents (together with reference to the terms of the parties' written contract) will determine plaintiffs' claim, and there is nothing in plaintiffs' hard drives or e-mails that could or would change the outcome of this purely objective test.  In this regard it bears noting that none the e-mails or any other of the millions of pages of documents SanDisk has already produced apparently supports plaintiffs' claims, as not one is referenced in plaintiffs' motion papers.

Moreover, by admission, the only part of the U3 device that plaintiffs had any connection to was the DID's components, and the evidence shows that these were composed entirely of non-proprietary, industry-standard data structures, which by definition cannot constitute MDRM technology or its derivatives.  (Gonzalez Decl. ¶¶ 8, 12.)  Thus, not only have plaintiffs failed to "present *extrinsic evidence* tending to show that the destroyed [documents] would have been favorable to their case," *Toussie*, 2007 WL 4565160, at *8, the extrinsic evidence demonstrates that the missing evidence would *not* be favorable.  As such, plaintiffs' sanctions motion should

---

[12] The principal meeting with SanDisk executives that plaintiffs reference allegedly occurred in September 2006, during which they contend that SanDisk agreed to pay plaintiffs the full earn-out (*See* Harkabi Decl. ¶ 8; Elazar Decl. ¶ 6.)  SanDisk strenuously disputes plaintiffs' account of the meeting.  (*See* Harari Decl. ¶¶ 5–7.)  However, what was or was not said in that meeting is entirely irrelevant as it would neither prove nor disprove whether the U3 device in fact uses or embeds plaintiffs' technology. The same is true for what plaintiffs allegedly discussed with the U3 team, SanDisk executives, or just between themselves.  (*See, e.g.*, Harkabi Decl. ¶¶ 7, 9; Elazar Decl. ¶¶ 5, 7.)

be denied.  *See White v. Fuji Photo Film USA, Inc.*, 2009 WL 1528546, at *1 (S.D.N.Y. June 1, 2009) (denying sanctions where plaintiff did not show that information on her personal work computer, which employer destroyed, was sufficiently relevant to her claims); *Hamre*, 2005 WL 1083978, at *3 (denying sanctions where plaintiff failed to establish missing documents' materiality; showing of "temporal coincidence" not sufficient).

## II.   The requested sanctions are particularly unwarranted.

### A.   Terminating sanctions are not appropriate where, as here, there is no evidence of bad faith or willfulness.

Although a court has discretion in fashioning the appropriate sanction for spoliation, a court must consider, in light of the full record:

> (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party.

*Arista Records LLC*, 633 F. Supp. 2d at 138.  Applying these factors to the facts here does not even remotely warrant the entry of terminating sanctions.  There has been no proof of SanDisk's willfulness or bad faith; there is no history of non-compliance; lesser sanctions have never been sought, let alone granted; there has been no warning of the risk of terminating sanctions; the client has consistently acted in a good-faith manner; and there is little or no prejudice to plaintiffs because they have not demonstrated that the missing records will substantially or meaningfully impair their ability to litigate this case.  *See Indem. Ins. Co. of North Am. v. Liebert Corp.*, 1998 WL 363834, at **4–5 (S.D.N.Y. June 26, 1987) (requiring showing that plaintiffs' negligent destruction of evidence "substantially impaired" ability to litigate case).

As the Circuit Court has observed, dismissal as a punishment for spoliation is a "drastic remedy" that "should be imposed only in extreme circumstances, usually after consideration of

alternative, less drastic sanctions." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) (finding district court's entry of default judgment arising from non-production of documents to be abuse of discretion); *Dahoda v. John Deere, Co.*, 216 Fed. Appx. 124, 125 (2d Cir. Feb. 9, 2007) (observing that dismissal is "draconian remedy" and finding that district court abused its discretion by imposing dismissal as sanction and suggesting lesser remedies); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (reversing district court's dismissal even where plaintiff did not properly preserve equipment essential to case, and materially damaged defendant's central defense); *see also Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, at *9 (S.D.N.Y. Aug. 11, 2005) (lack of bad faith counsels against imposing draconian remedy of default judgment).

The "ultimate sanction" of a default judgment is particularly inappropriate where, as here, there is no finding of bad faith or willfulness. *See Schwarz*, 2009 WL 3459217, at *11 (denying plaintiff's requested remedy to strike defendant's answer where there was no showing of defendant's bad faith and noting that requested relief "would be exorbitant"); *Hamre*, 2005 WL 1083978, at *2 (rejecting claim that defendants acted in bad faith and denying terminating sanctions); *Golia v. The Leslie Fay Co., Inc.*, 2003 WL 21878788, at *10 (S.D.N.Y. Aug. 7, 2003) (rejecting termination sanctions because "[w]hile [defendant's] conduct was undoubtedly egregious and grossly negligent, there is no evidence that [defendant's employees] failed to produce the documents, and eventually destroyed them, expressly to keep plaintiffs from seeing them, or to thwart the litigation process."); *Valentine v. Mercedes-Benz Credit Corp.*, 1999 WL 787657, at*5 (S.D.N.Y. Sept. 30, 1999) (holding that plaintiffs' destruction of evidence was not willful and thus not extreme enough to warrant dismissal or even adverse inference).

In support of their request, plaintiffs cite only two cases in which dismissal was actually granted.  These cases are readily distinguishable.  In *Gutman v. Klein*, 2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008), the court granted a default judgment, but only after a court-appointed expert found that only hours before the plaintiff arrived for inspection of defendants' laptop, defendants deliberately and in bad faith downloaded a file-deletion program from the internet, which they used to delete hundreds of documents, and then attempted to conceal evidence of that destruction.  *Id.* at *12.  And in *Miller v. Time-Warner Commc'ns, Inc.*, 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999), the court dismissed the plaintiff's complaint after finding that:  (i) the plaintiff deliberately erased information from documents to prevent their discovery; (ii) the plaintiff committed perjury at her deposition when questioned about the issue; (iii) the plaintiff repeated and elaborated her perjury at a hearing before the court; and (iv) the plaintiff's attorney also made false statements during the deposition and court hearing.  *Id.* at **1–2.[13]

*Gutman* and *Miller* are also to be contrasted with the vast majority of reported decisions where terminating sanctions have been rejected.  *See, e.g.*, *Shcherbakovskiy*, 490 F.3d at 140; *Dahoda*, 216 Fed. Appx. at 125; *Arista Records LLC*, 633 F. Supp. 2d at 141 (denying terminating sanctions even where defendants' spoliation was intentional and in bad faith); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 2008 WL 1771917, at *4 (refusing to impose "drastic sanctions" where defendants actions did not "severely prejudice" plaintiffs); *Hamre*, 2005 WL 1083978, at **2–3; *De Espana*, 2007 WL 1686327, at **4–5; *Chan*, 2005 WL 1925579, at *9;

---

[13] Plaintiffs' citation to *Cine Forty-Second Street Theatre Corp.*, 602 F.2d 1062 (2d Cir. 1979) (which did not order terminating sanctions), is similarly distinguishable because there the Second Circuit was expressly considering a party's failure to comply with Rule 37 discovery orders.  *See Warren Publ'g. Co. v. Harris Publ'ns, Inc.*, 1999 WL 558140, at *2 (S.D.N.Y. Jul. 30, 1999) (rejecting plaintiff's reliance on *Cine Forty-Second Street* where there was no violation of court order).

*Valentine*, 1999 WL 787657, at*5; *Indem. Ins. Co. of North Am.*, 1998 WL 363834, at ** 5–6

(refusing to dismiss case even where plaintiff's spoliation of evidence prejudiced defendants).

Indeed even where there has been a demonstrated pattern of bad faith (which is not present here), courts in this Circuit are *still* reluctant to impose the "ultimate sanction." For example, in *Arista Records LLC*, 633 F. Supp. 2d 124, the court reviewed a series of defendants' bad-faith litigation conduct, including "wiping" hard drives belonging to its employees without backing up the data to the central server, engineering witness unavailability through the end of discovery, encouraging witnesses to evade service, submitting false sworn answers to interrogatories, and violating two discovery orders. Even in the face of this egregious and repeated behavior, the court reasoned that dismissal was not warranted: "While I agree that Plaintiffs' evidence credibly illustrates a pattern of destruction of critical evidence, a failure to preserve other relevant documents and communications, and at best dilatory (and at worst, bad-faith) tactics, . . I am not prepared to impose the ultimate sanction." *Id.* at 139. Similarly, in *Donato v. Fitzgibbons*, 172 F.R.D. 75 (S.D.N.Y. 1997), a defendant destroyed police headlights that were relevant to determining the defendant's liability and subsequently lied during depositions and to the court about the headlights' existence. Despite the court's finding that the defendant had handled "its responsibilities in connection with this litigation in bad faith" and destroyed the evidence as a result of gross negligence, the court refused impose the harshest of sanctions. *Id.* at 82–84. In doing so, the court noted that "even the degree of bad faith and gross negligence shown here does not merit striking the answer, or directing a verdict, or directing the jury to conclude as a matter of fact that the headlights were off at the time of the accident." *Id.* at 84. Again, SanDisk's actions here do not even approach the bad faith conduct that courts have found to be *insufficient* to justify terminating sanctions.

**B.   Plaintiffs' request for an adverse inference is tantamount to terminating sanctions and should be denied.**

Plaintiffs request, in the alternative, that the Court issue an order:  (i) finding that the evidence from plaintiffs' e-mail and hard drives would have supported plaintiffs' claims that the U3 device used or employed the MDRM technology or a derivative; (ii) finding that SanDisk acknowledged in 2006 that plaintiffs were entitled to the full earn-out and instructed them to be paid; and (iii) precluding SanDisk from offering evidence on these issues.  (Pl. Mem. at 24–25.) This request should be denied for several reasons.

First, plaintiffs have not shown that SanDisk acted in bad faith, nor demonstrated the relevance or the favorable-nature of the missing information through extrinsic evidence; prerequisites for any sanction here.  *See Scalera*, 2009 WL 3126637, at *17 (denying adverse inference where defendant had breached duty to preserve but acted only negligently in destroying e-mails, and plaintiff offered no extrinsic evidence on relevance); *White*, 2009 WL 1528546, at *1 (denying motion for adverse inference where plaintiff did not show sufficient relevance); *Toussie*, 2007 WL 4565160, at *9 (denying adverse instruction even though evidence was clear that back-up tapes and e-mails had been destroyed and deleted where plaintiff did not sufficiently demonstrated that missing data was favorable or relevant); *Treppel*, 249 F.R.D. at 123 (denying motion for adverse inference instruction where plaintiff failed to show adequate relevance of missing information).

Second, an adverse inference instruction is unwarranted because plaintiffs have all the evidence necessary to support their claim.  *See Port Auth. Police Asian Jade Soc'y of New York & New Jersey Inc. v. Port Auth. of New York and New Jersey*, 601 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) (denying adverse instruction where destroyed performance evaluations were only one factor and plaintiffs possessed "ample evidence to permit the jury to draw conclusions

on the relative qualifications of the plaintiffs and their non-Asian colleagues"). Here, included among the seven million pages of documents SanDisk has produced to plaintiffs, are the *only* documents that matter: the computer codes for the U3 device and the MDRM technology.

Finally, plaintiffs' requested inference is "tantamount to a dismissal." When considering an adverse inference request, "[a]s long as the plaintiffs can be protected from undue prejudice, the defendants should not be disabled from presenting contrary, truthful evidence." *Chan*, 2005 WL 1925579, at *9. Plaintiffs' suggested adverse inference is not required to restore them to the position they would occupy "but for" the alleged spoliation. *See Port Auth. Police Asian Jade Soc'y of New York & New Jersey Inc.*, 601 F. Supp. 2d at 570–71. Rather, plaintiffs' suggested adverse instruction would effectively operate as a terminating sanction.

### C.   Plaintiffs' request for costs to conduct additional discovery is premature.

The Court should also deny plaintiffs' request for reimbursement for future costs they allegedly may incur in seeking "additional discovery, including depositions" (Pl. Mem. at 25), as there is no evidence at this time that such discovery will be required. Since no depositions have occurred yet, plaintiffs will not have to retake any, and plaintiffs have failed to identify any witnesses other than those whose depositions they are otherwise going to undertake, that would be necessary because of the missing records. *See Chan*, 2005 WL 1925579, at *10 ("[T]he plaintiffs have not demonstrated that they engaged in any discovery that they would not otherwise have conducted merely to obtain the equivalent of the destroyed evidence.").

### III.  Plaintiffs' Motion is Premature

As is evident from the arguments above, plaintiffs' motion is at best premature. To begin with, SanDisk is in the process of attempting to restore the missing e-mails from backup tapes, which if successful would substantially moot this motion. Moreover, among the issues central to this Court's determination of the motion are (i) whether extrinsic evidence establishes that

information from the missing records would be favorable to the plaintiffs and (ii) whether that information materially prejudices plaintiffs' ability to prosecute their case.  It is difficult to comprehend how the Court could make either of those determinations in advance of the close of discovery, particularly in light of SanDisk's ongoing tape review.  As one court has observed, "[t]ypically, the evidence used to establish relevance of missing documents is deposition testimony."  *De Espana*, 2007 WL 1686327, at *8.  *See also Donini Int'l, S.P.A. v. Satec (U.S.A.), LLC*, 2006 WL 695546, at *9 (S.D.N.Y. Mar. 16, 2006) (ruling that motion for sanctions could be considered closer to trial when discovery was complete); *Steele v. Costco Wholesale Corp.*, 2005 WL 1068137, at *2 (E.D.N.Y. May 6, 2005) (affirming magistrate's order denying "extreme sanction" of striking defendants' answer and determining that adverse inference charge would be premature at that stage of litigation).  Accordingly, SanDisk respectfully suggests that, at a minimum, the Court stay the motion until the close of discovery, when the extent and consequence of the missing records can best be ascertained.

## CONCLUSION

For the reasons stated above, SanDisk respectfully submits that the Court should dismiss the motion in its entirety or at a minimum stay it until the close of discovery.


Dated:   New York, New York                        O'MELVENY & MYERS LLP
         December 18, 2009


                                                   By:  /s/ Charles E. Bachman
                                                       Charles E. Bachman
                                                       Times Square Tower
                                                       7 Times Square
                                                       New York, New York 10036
                                                       Tel:    (212) 326-2000
                                                       Fax:    (212) 326-2061
                                                       Email:  cbachman@omm.com

                                                       *Attorneys for Defendant SanDisk Corp.*