UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
DAN HARKABI and GIDON ELAZAR,       :
                                    :
                    Plaintiffs,     :    08 Civ. 8203 (WHP)
                                    :
        -against-                   :    MEMORANDUM & ORDER
                                    :
SANDISK CORPORATION,                :
                                    :
                    Defendant.      :
----------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/23/10
```

WILLIAM H. PAULEY III, District Judge:

    Electronic discovery requires litigants to scour disparate data storage mediums and formats for potentially relevant documents. That undertaking involves dueling considerations: thoroughness and cost. This motion illustrates the perils of failing to strike the proper balance.

    Plaintiffs Dan Harkabi ("Harkabi") and Gidon Elazar ("Elazar") seek sanctions against Defendant SanDisk Corporation ("SanDisk") under Rule 37 of the Federal Rules of Civil Procedure and this Court's inherent powers. Plaintiffs assert that SanDisk failed to produce (1) data contained on laptops that Harkabi and Elazar used while employed at SanDisk and (2) some of Harkabi's and Elazar's corporate email. SanDisk does not contest that it failed to produce the laptop data but argues it was lost despite reasonable steps to preserve it. After this motion was briefed, SanDisk identified the location of the missing emails on backup tapes and agreed to produce them. For the following reasons, Plaintiffs' motion is granted in part and denied in part.

BACKGROUND

I. The Underlying Action

This action concerns claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Harkabi and Elazar were executives and principal shareholders of MDRM, Inc. ("MDRM"), a developer of software for computer flash drive technology. In 2004, SanDisk acquired MDRM for $14 million, paying $10 million to Plaintiffs, and placing $4 million in escrow to be paid to Plaintiffs subject to an "earn-out" provision. The "earn-out" provision was based on the number of units SanDisk sold "using or embedding" MDRM technology "and/or Derivatives therefrom" in the two years following the acquisition.[1] As part of the deal, Harkabi and Elazar relocated from Israel to the United States to work for SanDisk.

Harkabi and Elazar claim that SanDisk used MDRM technology or its derivatives in two products—the Cruzer Freedom flash drive (the "Cruzer Freedom") and the U3 flash drive (the "U3"). They assert that SanDisk did not fulfill its obligation to market the Cruzer Freedom and wrongfully refused to credit Plaintiffs for use of MDRM technology in the U3. Based on lackluster sales of the Cruzer Freedom and SanDisk's contention that MDRM technology was

---

[1] The stock purchase agreement defined "Derivatives" as: "(a) any computer program (whether in source or object code form) port, work, product, service, improvement, modification, revision, alteration, enhancement, abridgment, condensation, expansion, new version, translation, adaptation, design, concept, in any medium, format or form whatsoever, that is derived in any manner, directly or indirectly, from the MDRM Technology or any part or aspect thereof or that utilizes or incorporates such a preexisting work or any part or aspect thereof, or any other form in which the MDRM Technology may be recast, transformed or adapted; (b) all 'derivative works' as defined in copyright law of the United States, the MDRM Technology and (c) all materials and documentation related to each of the foregoing." (Affidavit of Dan Harkabi dated Nov. 19, 2009 ("Harkabi Aff.") Ex. 1: Amended and Restated Stock Purchase Agreement dated Sept. 13, 2004, at 4.)

2

not incorporated in the U3, SanDisk offered to pay Plaintiffs only $800,000 from the earn-out escrow. When Harkabi and Elazar continued to press for full payment, SanDisk fired them.

II. The Alleged Discovery Violations

    A. The Laptops & Emails

SanDisk issued laptops and corporate email accounts to Harkabi and Elazar which they used throughout their employment. (Elazar Decl. ¶¶ 1, 8.) With a dispute brewing, Plaintiffs' counsel sent SanDisk a document preservation letter. (Declaration of Charles Stillman dated Nov. 18, 2009 ("Stillman Decl.") Ex. 1: Letter from Diane Doolittle to Megan Comport dated Mar. 7, 2007.) In response, SanDisk's in-house counsel circulated four "Do-Not-Destroy" memoranda and instructed SanDisk's Director of Global Operations to preserve the Harkabi and Elazar laptops. Acting on those instructions, the laptops were placed in a secure storage area where they remained for more than a year. (Declaration of Charles E. Bachman dated Dec. 18, 2009 ("Bachman Decl.") Ex. K: Declaration of Gurpreet Sahni dated Sept. 22, 2009 ("Sahni Decl.") at ¶ 3.)

In early 2008, SanDisk installed a new system on its servers called "Evault" to provide improved and centralized email archival services. (Stillman Decl. Ex. 1: Letter from Diane Doolittle to Megan Comport dated Mar. 7, 2007; Bachman Decl. Ex D: Declaration of Julie Liedtke dated May 7, 2009 ("Liedtke Decl.") ¶ 8.) Thereafter, a helpdesk employee contacted SanDisk's Director of Information Security to ascertain whether the Harkabi and Elazar laptops could be reissued to other employees after imaging and preserving the data from their hard drives. (Sahni Decl. ¶ 10.) That request was forwarded to SanDisk's in-house counsel and, according to the helpdesk employee, approved. (Sahni Decl. ¶¶ 8, 10.) Then, the Harkabi

3

and Elazar laptops were imaged and the data saved on a SanDisk file server. (Sahni Decl. ¶¶ 10-11.)

B. <u>The Discovery Disputes</u>

On December 31, 2008, Plaintiffs requested electronic discovery from SanDisk. (Stillman Decl. Ex. 4: Plaintiffs' First Request to Defendant for Production of Documents dated Dec. 31, 2008.) In February 2009, SanDisk began searching its file servers, but could not locate data from the Harkabi and Elazar laptop hard drives. (Bachman Decl. Ex. J: Declaration of Scott Dillon dated Sept. 22, 2009 ("Dillon Decl.") ¶ 11.) In April 2009, SanDisk provided search term reports indicating that "Elazar" returned only five hits, and that no email was located for "Harkabi." At that time, SanDisk's counsel advised Plaintiffs' counsel that, when employees leave the company, their laptops typically are recycled 30 days later. (Stillman Decl. ¶ 5.) However, SanDisk's counsel did not disclose that the Harkabi and Elazar laptops had been secured for a year and that efforts to locate the laptop data on SanDisk's servers had been unsuccessful.

Plaintiffs countered by noticing a Rule 30(b)(6) deposition of SanDisk on topics relating to the preservation of documents. (Stillman Decl. Ex. 7: Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6) dated Apr. 16, 2009.) That deposition was adjourned when SanDisk provided a declaration from in-house counsel attesting: "I have no reason to believe that the four 'Do-Not-Destroy' Memoranda issued on April 12, 2007, were not fully complied with by SanDisk and its employees, temporary employees, and contractors." (Liedtke Decl. ¶ 9.)

On May 22, 2009, Plaintiffs served SanDisk with a specific request for copies of the hard drives of their SanDisk-issued laptops. (Stillman Decl. ¶ 7.) While awaiting a response to that request, SanDisk agreed to produce electronic discovery returned by Plaintiffs' previously

4

proposed search terms. (Stillman Decl. ¶ 7.) On June 18, 2009, SanDisk produced 1.4 million electronic documents, and characterized that native production as "everything." (Bachman Decl. Ex. F: Letter from Charles Bachman to the Court dated June 18, 2009.) Four days later, SanDisk declined to produce the Harkabi and Elazar hard drives, stating that "all electronic documents from [the] hard drive[s] that are relevant to this dispute have already been produced." (Stillman Decl. Ex. 11: SanDisk's Responses and Objections to Plaintiffs' Request to Defendant for Production of Tangible Things dated June 22, 2009.)

Plaintiffs were left to rummage through SanDisk's native production for their laptop data and email files. Despite considerable effort, Harkabi and Elazar could not find any of the materials they remembered being on their laptop hard drives—including meeting notes, calendar entries, and digital photographs of technical schematics drawn by Elazar on white boards—showing their involvement in developing the U3. (Harkabi Aff. ¶¶ 4, 7; Affidavit of Gidon Elazar dated Nov. 18, 2009 ("Elazar Aff.") ¶¶ 2, 5.)

On July 28, 2009, SanDisk's counsel disclosed that information from the hard drives had not been included in the native production. In August 2009, SanDisk conducted additional searches for the hard drive data, including a review of a catalogue of backup tapes and an index of all available laptop images. On September 10, 2009, SanDisk acknowledged to Plaintiffs that it was unable to locate the laptop data on SanDisk's servers or backup tapes despite its "best efforts." (Bachman Decl. Ex. H: Letter from Charles Bachman to Charles Stillman dated Sept. 10, 2009.)

Harkabi and Elazar analyzed SanDisk's native production. From their review, they discovered that (1) SanDisk produced fewer emails from Harkabi and Elazar than from the nineteen other agreed-upon custodians; (2) SanDisk did not produce certain responsive emails

5

that Harkabi and Elazar had in their own files; and (3) none of the emails identified by SanDisk as coming from Harkabi's and Elazar's custodian files were solely between Harkabi and Elazar. (Elazar Aff. ¶¶ 10-12.) Reasoning from these data points, Harkabi and Elazar concluded that SanDisk had not actually produced any emails from their custodian files. (Elazar Aff. ¶ 12.) They hypothesize that SanDisk cobbled together emails from other custodians and glossed over the fact that Harkabi's and Elazar's files were missing. (Elazar Aff. ¶ 12.)

On this motion, SanDisk concedes that the native production did not include some Harkabi and Elazar emails because they were not preserved during transfer to the Evault system. The Evault transfer was implemented only for current employees. That Harkabi and Elazar were former employees subject to "Do-Not-Destroy" memoranda appears to have been ignored. (Def's Mem. at 7.) Because SanDisk did not engage this reality, it did not search its backup tapes—an undertaking that would require processing billions of pages of documents at significant cost. (Declaration of James G. Barrick, Jr. dated Dec. 18, 2009 ¶¶ 5-6.) After briefing on this motion, SanDisk searched its backup tapes and began recovery of the missing emails. (Transcript of Oral Argument dated Jan. 29, 2010 at 20-21, 26.)

While it appears that SanDisk will make a complete production of Plaintiffs' emails, the deficiencies in its native production might have gone undetected were it not for Plaintiffs' diligence. Moreover, the incomplete native production spawned significant delay and expense for Plaintiffs.

## DISCUSSION

I. Legal Standard

A district court has "broad discretion in fashioning an appropriate sanction" when addressing discovery violations under its "inherent power to manage its own affairs." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106-07 (2d Cir. 2002). The Court of Appeals has recognized the need for a "case-by-case approach to the failure to produce relevant evidence" in determining sanctions. Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001); see also Reilly v. Natwest Mkts. Grp., Inc., 181 F.3d 253, 267 (2d Cir. 1999) ("Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case.").

The laptop images and missing emails present discrete issues: spoliation and delayed production. Where a party seeks a severe sanction such as dismissal or an adverse inference, the movant must prove (1) that the spoliating party had control over the evidence and an obligation to preserve it at the time of destruction or loss; (2) that that party acted with a culpable state of mind upon destroying or losing the evidence; and (3) that the missing evidence is relevant to the movant's claim or defense. Residential Funding Corp., 306 F.3d at 107.

There is no dispute that the first of these elements is satisfied. SanDisk had control over the laptops and its email servers at all times and recognized its obligation to preserve this evidence by issuing several "Do-Not-Destroy" memoranda. Thus, the remaining questions are whether SanDisk acted with a culpable state of mind and whether the missing evidence is relevant to Harkabi and Elazar's claims.

A. State of Mind

"[T]he culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." Residential Funding Corp., 306 F.3d at 108 (internal quotation marks and citations omitted). In the discovery context, negligence is a "failure to conform to th[e] standard" of "what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 464 (S.D.N.Y. 2010). "A failure to conform to this standard is negligence even if it results from a pure heart and an empty head." Pension Comm., 685 F. Supp. 2d at 464.

Gross negligence is the "failure to exercise even that care which a careless person would use." Pension Comm., 685 F. Supp. 2d at 464. In the discovery context, courts have found gross negligence where data was spoliated because a party failed to take widely-recognized steps to preserve it, such as failing to issue a written litigation hold or failing to prevent backup tapes from being erased. See In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 198-99 (S.D.N.Y. 2007) (collecting cases); see also Pension Comm., 685 F. Supp. 2d at 464.

Plaintiffs advance four arguments why a culpable state of mind can be inferred: (1) SanDisk's in-house counsel did not issue "Do-Not-Destroy" memoranda until a month after Harkabi and Elazar sent SanDisk a litigation hold letter; (2) SanDisk's in-house counsel did not adequately supervise the document preservation efforts; (3) SanDisk's expertise in electronic data storage undermines its claim of an innocent mistake; and (4) SanDisk delayed disclosing that the laptop data and emails were not included in the native production.

Plaintiffs' first argument is unpersuasive. The loss of data was not attributable to the delay in issuing the Do-Not-Destroy memoranda. The transfer of email files to the Evault system and the deletion of the laptop hard drives both occurred despite the litigation hold memoranda.

As for Plaintiffs' second point, while SanDisk's in-house counsel was involved at several steps of the document preservation and collection process, it was notably absent at critical junctures. In particular, SanDisk offers no direct evidence that in-house counsel supervised—or even approved—the copying and wiping of the laptop hard drives. No memoranda, email, or testimony corroborates the helpdesk employee's assertion that in-house counsel authorized reissuance of the Harkabi and Elazar laptops. Likewise, there is no evidence that in-house counsel was involved with the transfer of email archives to the Evault system, when Harkabi's and Elazar's emails were deleted from readily-searchable servers.

Plaintiffs' third argument must mortify SanDisk, a global business that champions itself a leader in electronic data storage. Its size and cutting-edge technology raises an expectation of competence in maintaining its own electronic records. The concatenation of omissions and missteps at SanDisk reveal a lack of attention to detail that has worked a hardship on the Plaintiffs and delayed this litigation.

Finally, Plaintiffs and SanDisk dispute SanDisk's forthrightness in describing its productions. SanDisk asserts that its discovery responses were appropriate because it produced electronic documents based on mutually agreed search terms. (Bachman Decl. Ex. G: Letter from Charles Bachman to Daniel Shapiro dated June 18, 2009 ("June 18 Letter").) However, SanDisk described its native production as: "520 GB of documents in native format, which were gathered from the agreed-on custodians at our client, based upon plaintiffs' search terms." (June

9

18 Letter.) Harkabi and Elazar were among the "agreed-upon custodians," yet their custodian files were not included.

At a minimum, SanDisk was negligent. See Pension Comm., 685 F. Supp. 2d at 464 ("[T]he failure to collect records—either paper or electronic—from key players constitutes gross negligence or willfulness as does the destruction of email or backup tapes after the duty to preserve has attached."); Treppel v. Biovail Corp., 249 F.R.D. 111, 121 (S.D.N.Y. 2008) (taking inadequate measures to preserve the electronically stored information of key executives and their support staff was "at least negligent"). The undisputed facts reveal a cascade of errors, each relatively minor, which aggregated to a significant discovery failure.

B. Relevance

When a spoliating party is negligent, the innocent party bears the burden of proving the relevance of the lost materials in order to justify the imposition of a severe sanction. Pension Comm., 685 F. Supp. 2d at 467-68. The innocent party may do so by "adduc[ing] sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" Residential Funding Corp., 306 F.3d at 109 (quoting Kronish v. U.S., 150 F.3d 112, 127 (2d Cir. 1998).) "Courts must take care not to 'hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence,' because doing so 'would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." Residential Funding Corp., 306 F.3d at 109 (quoting Kronish, 150 F.3d at 127.)

Here, Plaintiffs have adduced evidence sufficient for the Court to conclude that the laptop data is relevant. Harkabi and Elazar submitted affidavits cataloging the contents of the

10

missing laptops and their work embedding MDRM technology in the U3. Plaintiffs aver that the laptop data is relevant because the contract provides that technology "derived in any manner, directly or indirectly, from the MDRM Technology" counts towards the earn-out. Thus, Harkabi and Elazar contend that evidence showing their involvement in the development of the U3 is relevant to whether technology used in the U3 was derivative of MDRM technology, even if the source code is different.

SanDisk does not challenge Harkabi's and Elazar's description of the laptop data. Rather, it argues that the missing data is irrelevant because a determination of whether MDRM technology or its derivatives were used in the U3 product is a technical question resolved by examining the U3's schematics. However, this Court need only determine whether, through the spoliation of laptop data, Plaintiffs were deprived of evidence relevant to their claims, not whether their interpretation of the Agreement should prevail. Residential Funding Corp., 306 F.3d at 109 (quoting Kronish, 150 F.3d at 127). Without electronic documents corroborating their testimony about the design of the U3, Plaintiffs have lost the opportunity to present potentially powerful evidence to a jury. Accordingly, Plaintiffs have satisfied the relevance prong.

II. Sanctions for Spoliation of the Laptop Images

Plaintiffs seek terminating sanctions. Terminating sanctions are a "drastic remedy" that "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988); see also Pension Comm., 685 F. Supp. 2d at 469-70 (terminating sanctions are justified in "only the most egregious cases, such as where a party has engaged in

11

perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives").

Such an extreme sanction is not warranted here. There is no evidence that SanDisk engaged in egregious conduct such as the intentional destruction of evidence. See, e.g., McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d 440, 461-62 (S.D.N.Y. 2002); see also Pension Comm., 685 F. Supp. 2d at 469-70.

Nonetheless, Plaintiffs have lost access to relevant evidence. "The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." Residential Funding Corp., 306 F.3d at 108. Courts have adopted adverse inference instructions of varying degrees of harshness. In the most harsh formulations, a jury is instructed that certain facts are deemed admitted and must be accepted as true. Pension Comm., 685 F. Supp. 2d at 470. The least harsh instruction permits, but does not require, a jury to presume that the lost evidence is both relevant and favorable to the innocent party. Pension Comm., 685 F. Supp. 2d at 470-71; see, e.g., Zimmermann v. Assoc's First Capital Corp., 251 F.3d 376, 383 (2d Cir. 2001). At trial, this Court will fashion an adverse inference instruction to the jury after all the evidence has been received.

III. Sanctions for the Late-Produced Emails

As this sanctions motion highlights, electronic discovery is not always easy or straightforward. And not every delay warrants sanctions. It appears that Plaintiffs will have the benefit of all of their emails not just at trial, but also during depositions. Thus, the prejudice to Harkabi and Elazar from late-produced emails is contained. However, SanDisk's

12

misrepresentations about its native production obscured the deficiencies and stopped discovery in its tracks. But for Plaintiffs' forensic analysis and their counsel's persistence, those deficiencies may not have come to light. Plaintiffs were forced to brief a motion and endure a lengthy delay.

While terminating sanctions are not warranted, a monetary sanction is appropriate to compensate Harkabi and Elazar for their "David-and-Goliath-like" struggle for electronic discovery with SanDisk. Richard Green v. McClendon, 262 F.R.D. 284, 292 (S.D.N.Y. 2009). Moreover, a monetary sanction may also serve to deter such conduct in the future. Green, 262 F.R.D. at 292 (S.D.N.Y. 2009); see also Pension Comm., 685 F. Supp. 2d at 471.

After oral argument, Plaintiffs' counsel estimated their attorney time and expenses relating to this sanctions application at $201,096.25. (See Docket No. 36: Letter from Charles Stillman to the Court dated Feb. 16, 2010.) Defendant argues that that estimate is excessive in view of the $4 million amount in controversy. (See Docket No. 37: Letter from Charles Bachman to the Court dated Feb. 22, 2010.) Plaintiffs estimated another $385,500 as the cost that an outside vendor would have charged to prepare SanDisk's native productions for review and analysis. But Harkabi and Elazar utilized their own substantial technical expertise to do the work themselves. And much of that work—loading and processing SanDisk's productions, importing those productions to a document review platform, and hosting that material online—would have been undertaken in any event to prepare for trial. Accordingly, this Court considers only attorneys' fees in fashioning a monetary sanction.

Given the prolonged delay attendant to the discovery irregularities, further sparring over attorneys' fees would be of little utility to the parties. Integral to a court's inherent power is the power to ensure that the game is worth the candle—that commercial litigation

13

makes economic sense. Electronic discovery in this case has already put that principle in jeopardy. From this Court's perspective, a monetary sanction of $150,000 should be sufficient to compensate Plaintiffs for their added expense and deter SanDisk from taking shortcuts. Experienced counsel on both sides of this litigation may accept this Court's view or not. If either side believes it necessary to litigate the precise dollar amount of a monetary sanction, then this Court will entertain further submissions. But any further detour into Rule 37 should be expedited because the parties are well past the time that they should be addressing the merits of this lawsuit. The parties shall submit a joint letter by September 3, 2010 informing the Court whether they accept the Court's view or wish to prolong this Rule 37 exercise.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion is granted in part and denied in part. The parties shall submit a joint letter by September 3, 2010 in accord with this Memorandum and Order. The Clerk of Court is directed to terminate this motion.

Dated: August 23, 2010
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Charles A. Stillman, Esq.
Stillman, Friedman & Shechtman, P.C.
425 Park Avenue
26th Floor
New York , NY 10022
*Counsel for Plaintiffs*

Charles Edward Bachman, Esq.
O'Melveny & Myers, LLP
Times Square Tower
7 Times Square
New York, NY 10036
*Counsel for Defendant*