UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DAN HARKABI & GIDON ELAZAR,           :
                                       :    08 Civ. 8203 (WHP)
                    Plaintiffs,        :
                                       :    MEMORANDUM & ORDER
        -against-                      :
                                       :
SANDISK CORPORATION,                   :
                                       :
                    Defendant.         :
------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/20/12

WILLIAM H. PAULEY III, District Judge:

        Dan Harkabi ("Harkabi") and Gidon Elazar ("Elazar," together, "Plaintiffs") assert, inter alia, a claim for breach of a contractual earn-out provision against SanDisk Corporation ("SanDisk") relating to the sale of flash memory products incorporating Plaintiffs' software. SanDisk moves to strike the trial testimony of Plaintiffs' expert Dr. Vijay Madisetti ("Dr. Madisetti") based on demonstratives used at trial. For the following reasons, SanDisk's motion is denied.

## BACKGROUND

        This Court's prior Memoranda and Orders set forth the underlying facts. See Harkabi v. SanDisk Corp., No. 08 Civ. 8203 (WHP), 2012 WL 826892, at *1-*3 (S.D.N.Y. Mar. 12, 2012); Harkabi v. SanDisk Corp., 275 F.R.D. 414, 415-18 (S.D.N.Y. 2010). This Court highlights only those facts relevant to the present motion below.

### I. Dr. Madisetti's Initial Expert Report

        On December 17, 2010, Plaintiffs served SanDisk with a copy of Dr. Madisetti's initial expert report. (Declaration of Michael H. Greunglas, dated Apr. 13, 2012 (the "Gruenglas

Decl."), Ex. A: Expert Report of Dr. Vijay K. Madisetti, dated Dec. 17, 2010 (the "Initial Report").) The Initial Report is eighty-six pages, consisting of 263 numbered paragraphs and attaching nine exhibits. One exhibit sets forth the materials Dr. Madisetti reviewed in connection with preparing the Initial Report. (Declaration of Scott M. Himes, dated Apr. 24, 2012 ("Himes Decl."), Ex. A: Exhibit B to the Initial Report.) Among other materials, Dr. Madisetti reviewed source code files for the BookLocker and U3 products at issue in this case. (Initial Report ¶ 4; see also Trial Transcript ("Tr.") 507-10.) At trial, these source code files were received in evidence. (See, e.g., Plaintiffs' Exhibit ("PX") 299, PX 305, PX 308, PX 310, PX 344, PX 346, PX 369.) The Initial Report also attached a detailed declaration of Elazar, setting forth specific information on the source code for both the BookLocker and U3 products at issue in this case. (Himes Decl., Ex. B: Exhibit D to the Initial Report.)

Section VI of Dr. Madisetti's Initial Report, titled "Summary of Code Analysis," is a twenty-five page detailed comparison of the BookLocker and U3 source codes. (Initial Report ¶¶ 152-250.) Subsection VI.A is titled "DID process and actions for BookLocker," and subsection VI.B is entitled "DID process and actions for U3." (Initial Report at 56, 73.) As these headings suggest, Section VI sets forth DID functions for BookLocker and U3 and "outlines supporting evidence" for each of the functions. (Initial Report ¶ 153.) The Initial Report states that a "comparison of sections A and B below illustrates the similarities between the DID process and actions in the manufacturing of both BookLocker and U3." (Initial Report ¶ 153.)

II. Dr. Johnson's Report

On February 16, 2011, SanDisk provided the report of its retained expert, Dr. Margaret L. Johnson, which contested Dr. Madisetti's opinions expressed in his Initial Report. (Gruenglas Decl., Ex. E: Expert Report of Dr. Margaret L. Johnson, dated Feb. 16, 2011 (the "Johnson Report").) Among the materials Dr. Johnson reviewed for purposes of her report were the same source code materials reviewed by Dr. Madisetti. (Johnson Report at 3.) Nonetheless, the Johnson Report does not address Dr. Madisetti's source code analysis related to DID functionality for BookLocker and U3, nor does it present an independent analysis of the BookLocker and U3 source codes. On cross-examination at trial, Dr. Johnson acknowledged that her report contains no discussion of Dr. Madisetti's code analysis. (Tr. 933-35.)

III. Dr. Madisetti's Rebuttal Report

On March 7, 2011, Dr. Madisetti submitted a fifty-three page rebuttal, containing nineteen figures and seventeen exhibits (including a List of Materials Reviewed). (Gruenglas Decl., Ex. B: Rebuttal Expert Report of Dr. Vijay K. Madisetti, dated Mar. 7, 2011 (the "Rebuttal Report," together with the Initial Report, the "Reports").) The Rebuttal Report principally addresses matters raised in the Johnson Report and includes additional analysis of the source code for BookLocker and U3 products. (Rebuttal Report ¶¶ 30-32, 48-50, 53, 121-123.) The Rebuttal Report notified SanDisk that Dr. Madisetti "reserve[d] the right to make demonstratives, presentations, tutorials, figures, and supporting examples from code if I am asked to do so at a later date, including trial." (Rebuttal Report ¶ 2.)

### IV. SanDisk's Pre-Trial In Limine Motion

In June 2011, SanDisk moved in limine to exclude at trial any expert testimony from Dr. Madisetti. (ECF Nos. 53, 54, 55.) SanDisk asserted that Dr. Madisetti "[did] not know what a U3 is," and that he had "no independent knowledge" whether the source code on which he based his opinions was, in effect, the right source code for the U3. (SanDisk's Memorandum of Law, dated June 20, 2011, at 2, 3 (ECF No. 54).) This Court rejected that argument, noting that Dr. Madisetti based his opinions on an analysis of the source code produced by SanDisk for the U3 product and a review of the materials listed in Exhibit B to the Initial Report. See Harkabi, 2012 WL 826892, at *2-*4 (listing the materials that Dr. Madisetti considered, including SanDisk documents pertaining to the development and specifications for the U3 device, Elazar's Declaration, deposition testimony of SanDisk personnel, and related deposition exhibits).

### V. SanDisk's Objections to Dr. Madisetti's Demonstratives At Trial

After this Court accepted Dr. Madisetti as an expert witness, SanDisk objected to the proposed use of demonstrative slides during his direct examination. (Tr. 392-94.) Each of the objected-to demonstratives presented a comparison between portions of BookLocker and U3 source code and showed how the excerpted code performed the same functionality. SanDisk objected that the demonstratives were "unsourced" and therefore were "new" and "outside the report[s]." (Tr. 394.) For example, SanDisk asserted with respect to a source code file noted within the demonstrative that "[i]f this file is not discussed [in the Reports], it doesn't get in." (Tr. 397.) This Court entertained letter submissions from the parties overnight, for consideration the following morning. (Tr. 401.) At the same time, Plaintiffs agreed to modify their

demonstratives and furnished an appendix sourcing them to Dr. Madisetti's Reports. (Tr. 413; PX 486A.) SanDisk maintained that the citations to the Reports still were inadequate.

Instead of making exhaustive admissibility determinations during trial, this Court reserved decision for post-trial consideration. (Tr. 414, 981-82.) Accordingly, this Court allowed Plaintiffs to use the demonstratives but stated: "[T]o the extent that Dr. Madisetti's testimony contains opinions and methodology not contained in or inconsistent with his reports, those portions of his testimony will be stricken upon application by the defendants after trial. . . . But if Dr. Madisetti's testimony merely provides evidentiary detail for the opinions expressed in his report, those portions can and will be considered." (Tr. 413-14.) This Court directed SanDisk to make its objections to specific testimony during Dr. Madisetti's examination. (Tr. 415.) SanDisk objected to testimony relating to forty demonstratives used during Dr. Madisetti's examination.

VI. SanDisk's Motion to Strike Portions of Dr. Madisetti's Testimony

SanDisk now moves to strike Dr. Madisetti's testimony corresponding to nineteen demonstratives because the testimony is purportedly outside the scope of his Reports. SanDisk argues that his testimony constituted "new expert opinions" because the demonstratives contained "excerpts" of code files, compared "specific code excerpts," and ascribed "values and functionalities to the code excerpts" that were not contained in the Reports. (SanDisk Memorandum of Law, dated Apr. 13, 2012 ("SanDisk Mem."), at 1, 2 (ECF No. 84).) According to SanDisk, the Reports did not adequately disclose the contents of the demonstratives because the specific code files "were merely cited" in Dr. Madisetti's Reports but were not "excerpted nor discussed . . . in the context" in which he gave trial testimony. (SanDisk Mem.

2.) The contested demonstratives are PX 486:27-39, 44, 45, 48, and 50-52 (Gruenglas Decl., Ex. H), and SanDisk moves to strike twenty-five pages of Dr. Madisetti's testimony related to these nineteen demonstratives.

## DISCUSSION

I. Legal Standard

The purpose of the expert disclosure rules is "to avoid surprise or trial by ambush." Am. Stock Exch., LLC v. Mopex, Inc., 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (internal quotation marks omitted); accord 6 Moore's Federal Practice § 26.23[2][b][ii], at 26-109 (3d ed. 2010) (disclosures should be sufficiently detailed "so as to avoid unfair surprise to the opposing party"). To that end, a testifying expert's Rule 26 report must contain a complete statement of all "opinions the witness will express" and the "basis and reasons for them," as well as the "facts or data" the expert considered in forming the opinions. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). An expert's trial testimony may be precluded based on nondisclosure only when it "'expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first [expert] report.'" Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (quoting Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001 (NRB), 2004 WL 345551, at *9 (S.D.N.Y. Feb. 23, 2004)). In Cedar Petrochemicals, the court permitted challenged expert evidence that merely summarized disputed industry practices because the evidence was "within the bounds" of the initial expert report. 769 F. Supp. 2d at 280 (internal citation omitted).

Numerous other courts in this district similarly hold that an expert can offer "evidentiary detail" at trial for opinions expressed in the expert's report. See, e.g., Emig v.

Electrolux Home Prods. Inc., No. 06 Civ. 4791 (KMK), 2008 WL 4200988, at *3 & **n.4 (S.D.N.Y. Sept. 11, 2008) (allowing expert affidavit because it did not offer "new opinions", but rather offered "more information and elaboration on opinions previously expressed in the [expert] report"); see also Takeda Chem. Indus., Ltd. v. Mylan Lab., Inc., No. 03 Civ. 8253 (DLC), 2006 WL 44053, at *2 (S.D.N.Y. Jan. 9, 2006) (noting that expert testimony may offer "evidentiary detail for the opinions expressed in [the] . . . expert report"); Commercial Data Servers, Inc. v. Int'l Bus. Mach. Corp., 262 F. Supp. 2d 50, 61 (S.D.N.Y. 2003) (permitting expert affidavit on summary judgment motion where the affidavit was "substantially similar" to expert report).

Consequently, "[s]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report . . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (internal quotation marks and footnotes omitted). The purpose of an expert's report "is not to replicate every word that the expert might say on the stand," but "to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, cross-examine, and to offer a competing expert[.]" Walsh v. Chez, 583 F.3d 990, 994 (7th Cir. 2009); see also Joseph S. v. Hogan, No. 06 Civ. 1042 (BMC), 2011 WL 2848330, at *4 (E.D.N.Y. July 15, 2011) ("Nothing in Rule 26(a)(2) requires the expert report to contain all of the supporting data within its four corners so long as the report clearly explains its methodology[.]"). At trial, this Court articulated the permissible scope for an expert's trial testimony. (Tr. 414 ("[I]f Dr. Madisetti's testimony

merely provides 'evidentiary detail for the opinions expressed in his report,' those portions can and will be considered.").)

Finally, even if a party fails to adhere strictly to the disclosure requirements of Rule 26, imposing the sanction of precluding expert testimony is not required. See Commercial Data Servers, 262 F. Supp. 2d at 62. Imposing sanctions is a matter committed to the district court's discretion, and the preclusion of evidence is a "drastic remedy." Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp., 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999) ("[R]efusing to admit evidence that was not disclosed in discovery is a drastic remedy and will apply only in situations where the failure to disclose represents a flagrant bad faith and callous disregard of the rules"). Indeed, "[p]recluding testimony of an expert, even when there has not been strict compliance with Rule 26, may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." Wechsler v. Hunt Health Sys. Ltd., 381 F. Supp. 2d 135, 155 (S.D.N.Y. 2003) (internal quotation marks and citation omitted).

II. Adequacy of Disclosures In Dr. Madisetti's Reports

Dr. Madisetti's Reports identified the key source code files for both the BookLocker and U3 products as well as the key functions within those files. The Reports explain how the functionalities in the code can be viewed as performing ten steps for manufacturing and creating a BookLocker or U3 product. In addition, his Reports set forth numerous exemplary comparisons of the files and functionalities of the BookLocker and U3 source code, showing how the relevant code files for U3 were based on code files originally created for BookLocker.

More specifically, his Initial Report contains a detailed "Summary of Code Analysis" (Section VI), which identifies key source code files and explains their function in the code (at specific code lines). (See, e.g., Initial Report, ¶ 156.) The Initial Report identifies these files for both BookLocker and U3 and opines that their functionalities in both the BookLocker and the U3 source code were the same. And each of the paragraphs under sections VI.A and VI.B of the Initial Report describe similarities between corresponding functions of the BookLocker and U3 source code, identifying the relevant files, and the commands and operations from the code. (Compare Initial Report, VI.A ¶¶ 154-211 (BookLocker), and VI.B ¶¶ 212-50 (U3).) The Rebuttal Report adds more examples. Dr. Madisetti described this methodology at trial, aided by the demonstratives at issue.

SanDisk's basic argument for striking Dr. Madisetti's testimony is that the trial demonstratives referred to particular lines of code that were not specifically excerpted for discussion in his Reports. This contention, however, does not warrant striking any testimony because the Reports gave adequate disclosure of what the demonstratives illustrated. Every demonstrative was properly sourced to the relevant BookLocker and U3 source code file, and Dr. Madisetti's Reports identified, discussed, and compared these source code files and their functionalities. The demonstrative excerpts simply illustrated what the source code files did, and that functionality had been set forth in the Reports.

An example illustrates the point. The first demonstrative at issue, PX 486-27, is titled "Step 1: Set Value Example Code Comparison." PX 486-27 describes the function "Input LOT6" and cites and excerpts lines of code from the source code file—designated "blmake manufacturing.cpp"—for both the BookLocker and U3 products. Dr. Madisetti's Initial Report

repeatedly references this very file and the function "cmd_makecd()." The excerpted code on PX 486-27 for the "Input LOT6" function is contained within the "cmd_makecd()" function discussed in the Initial Report. (See, e.g., Initial Report, ¶¶ 156, 161, 165, 167 (BookLocker); ¶¶ 215, 219 (U3).) At trial, Dr. Madisetti walked through this analysis. (Tr. 682-90.) Plaintiffs also submitted an exhaustive table showing references in Dr. Madisetti's Reports to the source code files and functions containing the code line excerpts for each of the challenged demonstratives. (Himes Decl., Ex. C.)

Consequently, Dr. Madisetti's trial testimony, aided by the contested demonstratives, was not beyond the scope of his Reports, and did not set forth any new or complex methodologies intended to fill a gap in his analysis. See Cedar Petrochemicals, 769 F. Supp. 2d at 279. At most, Dr. Madisetti's testimony provided evidentiary details for his opinions by further illustrating and elaborating the basis and methodology underlying them. Emig, 2008 WL 4200988, at *3. The authorities cited by SanDisk are inapposite. They stand for the noncontroversial position that an expert may not testify to an opinion he did not disclose during discovery. See, e.g., In re Omeprazole Patent Litig., No. M-21-81 et al. (BSJ), 2002 WL 287785, *8 (S.D.N.Y. Feb. 27, 2002) (precluding expert in patent litigation from giving opinions or relying on prior art, because he had not disclosed his opinions or reliance concerning those particular documents during discovery); Takeda Chem., 2006 WL 44053, *2 (granting plaintiff's motion to preclude new opinion testimony because the defendant conceded that the testimony amounted to a new opinion and failed to show that the challenged testimony was "evidentiary detail for the opinions expressed in [the expert] report").

Ultimately, SanDisk cannot credibly claim any "unfair surprise" from these demonstratives and the associated testimony. SanDisk's retained expert Dr. Johnson acknowledged that she was informed by Dr. Madisetti's Reports. At trial, she conceded that she understood Dr. Madisetti's citation function format and that she knew his format referred to code files, not lines of code. (Tr. 943-44.) She also agreed generally with Dr. Madisetti's descriptions of the BookLocker and U3 functions as described in Section VI of the Initial Report. (Tr. 940-41.) Most significantly, Dr. Johnson admitted that she had reviewed the source code files and their functions as set forth in Dr. Madisetti's Reports—without limiting her review to just some lines of the source code. (Tr. 935-46.) Like Dr. Madisetti, SanDisk's own expert understood that the source code files themselves—and not just isolated lines of code—had to be reviewed with a focus on their functionality, and she purported to review the files and understand their functionalities. Thus, there was nothing "unfair" or "surprising" about the demonstratives or Dr. Madisetti's testimony.

Accordingly, SanDisk's post-trial application to strike Dr. Madisetti's demonstrative-related testimony is wholly without merit. There was no disclosure violation by Plaintiffs, and SanDisk has no plausible claim of surprise. Rather, the post-trial motion appears to this Court as the penultimate chapter in a dispute that this Court characterized previously as a "David-and-Goliath-like struggle." Harkabi, 275 F.R.D. at 421.

CONCLUSION

For the foregoing reasons, SanDisk's motion to exclude testimony of Dr. Madisetti is denied. The Clerk of the Court is directed to terminate the motion pending at ECF No. 83.

Dated: June 20, 2012
      New York, New York

                             SO ORDERED:

                             WILLIAM H. PAULEY III
                                  U.S.D.J.

*Counsel of Record:*

Charles A. Stillman, Esq.
Stillman & Friedman, P.C.
425 Park Avenue, 26th Floor
New York, NY 10022
*Counsel for Plaintiffs*

Michael H. Gruenglas, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
*Counsel for Defendant*